IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,518

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS L. DUPREE,
*Appellant*.

SYLLABUS BY THE COURT

1.

The State bears the responsibility to ensure a defendant is afforded a speedy trial in compliance with K.S.A. 22-3402; a defendant does not need to take any affirmative action to ensure a speedy trial. Arraignment triggers the State's obligation to bring a defendant to trial within the statutory limits.

2.

Under the plain language of K.S.A. 22-3402, a continuance resulting from a defendant's request stays the running of the statutory speedy trial period. When the request is made by defense counsel, the request for continuance is attributable to the defendant unless the defendant timely voices an objection. Because a defendant's disagreement matters in a statutory speedy trial analysis, a defendant must have an opportunity to be present to express that disagreement.

3.

Under K.S.A. 2014 Supp. 22-3402(g), the legislature, which created the statutory right to speedy trial, has decided to eliminate the remedy for its violation in certain

circumstances. When considering if such a change should retrospectively apply, courts must consider whether retrospective application of legislation will affect vested or substantive rights.

4.

A vested right is one so fixed that it is not dependent on any future act, contingency, or decision to make it more secure. Three factors assist in determining if a right is vested:  (1) the nature of the rights at stake (*e.g.*, procedural, substantive, remedial), (2) how the rights were affected (*e.g.*, were the rights partially or completely abolished by the legislation; was any substitute remedy provided), and (3) the nature and strength of the public interest furthered by the legislation.

5.

K.S.A. 2014 Supp. 22-3402(g) does not create a vested right to dismissal; it is procedural and retroactively applies to an appellant seeking reversal based on an alleged statutory speedy trial violation.

6.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution applies to the State's privilege to strike prospective jurors through peremptory challenges. An appellate court utilizes a three-step analysis in recognition of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), when considering a challenge that the State exercised its peremptory strikes based on purposeful racial discrimination. First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason

must be facially valid, but it does not need to be persuasive or plausible. Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination.

7.

To preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial. Even when the district court rules on the admissibility of evidence before trial, a party must still make a timely objection at trial before the admission of the evidence because the unfolding of a case may require a reevaluation of the reasons for the initial ruling.

8.

Photographs of the extent, nature, and number of wounds are usually relevant in murder trials.

9.

Cumulative trial errors can require the reversal of a conviction if the totality of the circumstances substantially prejudiced the defendant and resulted in an unfair trial. A cumulative error issue does not arise, however, if an appellate court concludes none of appellant's claims of error have merit.

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed April 8, 2016. Affirmed.

*Kristen Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  On the evening of December 14, 2011, in Wichita, a group of four men carried out a burglary of a home, stealing televisions among other things. In the process, one of the men murdered Markez Phillips, a young man who was in the residence. The four men were eventually identified as Reginald Dupree, Daniel Dupree, Malek Brown, and Francis Dupree.

The instant defendant, Nicholas Dupree, was also quickly linked to the crime. The State's theory at trial was that he was a fifth member of the group and, as stated by one witness, the "mastermind." A jury accepted the State's theory and convicted Dupree of multiple crimes, including felony murder.

Dupree raises five challenges in this direct appeal, none of which requires the reversal of his convictions. His statutory speedy trial claim is foreclosed by our recent decision in *State v. Brownlee*, 302 Kan. 491, 354 P.3d 525 (2015). Dupree's *Batson* challenge is unpersuasive, and he failed to adequately preserve his appellate challenge to the voluntariness of an admission made during a custodial interview. Additionally, we conclude the district court did not abuse its discretion in admitting autopsy and crime scene photos. Finally, we find no cumulative error in this case. We, therefore, affirm Dupree's convictions and sentences.

FACTUAL AND PROCEDURAL BACKGROUND

Just before Phillips was murdered, he was watching a movie with his girlfriend Regina Stuart while Stuart cared for her infant nephew at her mother's house. The couple

4

heard a knock, and Phillips got up from the couch to answer the door. Stuart heard him ask who it was before two men tried to push the door open. She watched from the living room as Phillips began to fight the men. Then she heard what sounded like a firecracker and saw Phillips fall to the ground. He never got up.

Two men she had never seen before walked towards her. One pointed a black handgun at her and asked for her cell phone, which she gave him. As she pleaded for her life, they asked her where the safe was; her family did not have a safe. The men then walked Stuart at gunpoint to her mother's room, which the men ravaged, again demanding to know the location of a safe. After the men searched the house in vain for the safe, all the while threatening to kill Stuart, Stuart told them to take the televisions.

The men then forced Stuart to lie down on the living room floor next to her nephew. One of the men made a phone call for a truck so they could load the televisions. Shortly thereafter, another man came into the house and said, "You weren't supposed to kill nobody." Stuart recognized the man as Daniel Dupree, whom she had met through her sister. Stuart's sister had recently ended a relationship with a man related to Daniel—Nicholas Dupree. The men removed three televisions from the home while Phillips lay bleeding on the floor.

Later that night, Phillips died in the hospital as a result of the .45 caliber gunshot wound to his head.

Nicholas Dupree's name came up quickly in the investigation. Stuart initially suspected Dupree's involvement for two reasons. First, he had been repeatedly harassing her sister since their breakup. Apparently, Dupree believed the infant child was his, and he had been angry since Stuart's sister told him the child was not. Second, none of the

5

other men Stuart saw that night had ever been to her house. Yet, they seemed to know how to best gain access and where to look for things. Dupree, unlike the men in the house on that December evening, had been in the house numerous times.

Stuart also looked at photo arrays, and she quickly identified Daniel. She was also able to identify Malek Brown as the man who shot Phillips and Reginald Dupree as the man who accompanied Brown into the house.

In the hours of the night following the crime, Stuart's sister received multiple restricted calls to her cell phone and two unrestricted calls that displayed as coming from Dupree. She answered one of the restricted calls and recognized Dupree's voice. He told her: "Just like that slob nigga just got done, you and your boyfriend about to get done." He also texted her twice, saying, "I hope your kids aren't at home," and, "Where are you at?" Stuart's family told the case detective about the threats. Dupree would later admit to investigators, and also testify at trial, that he made those statements.

After Dupree's arrest, detectives interviewed him. He denied any involvement in the burglary and murder, but he did admit to calling Stuart's sister multiple times that night and threatening her.

Detectives also spoke with Marjorielle Evans, Daniel's girlfriend. After some hesitation, she told detectives what she knew, and she testified accordingly at trial. Evans lived with her kids, her mom, Daniel, Nicholas Dupree, and her brother and sister. Her room was downstairs, as was Dupree's. The day before the crime, she overheard Dupree talking to Brown about committing a burglary at the Stuart house. When Brown asked what was in the house, Dupree listed televisions and an Xbox. Evans provided

6

investigators with the names of the five men involved in the crime, and all were eventually taken into custody.

Investigators also discovered that after hearing about Phillips' murder, Evans got into a conversation with Stuart on Facebook about the crime. Evans wrote that Dupree showed the others where to go and told them to get the televisions. She said Phillips was in the wrong place at the wrong time. She said Dupree "was the mastermind of this whole thing," and she hoped they would catch Brown, who "had no reason to kill [Phillips]."

The jury also viewed video captured by a security camera located on a school district maintenance shed near the Stuart home. The images showed an SUV pulling up a short distance from the Stuart home and three men exiting. Reginald and Brown proceeded to the house; the other—Francis—walked up the street. The SUV, driven by Daniel, left the house, but it soon returned. Police officers located an SUV that belonged to Brown's girlfriend and matched the one on the video. Brown's girlfriend testified Brown had used her SUV the night of the murder. She also testified Evans told her, the day after Phillips' murder, that Brown had shot someone.

Notably, the jury heard that one shell casing found on the scene of the crime and one shell casing found in the backseat of the SUV were both fired from the same Hi-Point .45 caliber handgun. A bullet fragment taken from Phillips' head was also fired from that same gun.

Dupree testified at trial in his defense. He told jurors he knew nothing about the crime and had nothing to do with it. According to Dupree, he first learned about Phillips' murder when his half-sister called and told him. (She denied doing so.) Dupree said he felt bad Phillips was murdered because Phillips was his friend—and indeed they had

lived together for a few months. While he admitted that he threatened Stuart's sister and called Phillips a "slob nigga" (he could not explain why he would refer to his friend in such a derogatory way), he said he made the threat (1) because Stuart's sister's boyfriend threatened him first and (2) because he was angry that he was not allowed to see the child he thought was his son. Nevertheless, for reasons Dupree could not explain, none of the calls about which he testified showed up in his phone records.

After trial, the jury found Dupree guilty on all charged counts: first-degree felony murder, kidnapping, aggravated burglary, aggravated robbery, two counts of aggravated endangering a child, aggravated assault, and criminal threat. The district court later sentenced Dupree to life plus 142 months, and it denied his motion for a departure. Dupree timely filed a direct appeal to this court, which has jurisdiction under K.S.A. 2015 Supp. 22-3601(b)(3). Additional facts will be provided as relevant to the analysis of Dupree's appellate arguments.

ANALYSIS

ISSUE 1: *Dupree's convictions are not reversible under the speedy trial statute*.

A defendant can assert a speedy trial claim in two ways—one statutory and one constitutional. See, *e.g.*, *State v. Smallwood*, 264 Kan. 69, 74-76, 955 P.2d 1209 (1998) (analyzing a statutory speedy trial challenge differently than a constitutional challenge). Here, Dupree only presents a statutory challenge under K.S.A. 22-3402 and because he did not allege a constitutional speedy trial violation, he has abandoned the constitutional argument. See *State v. Williams*, 298 Kan. 1075, 1083-84, 319 P.3d 528 (2014) (issues not argued or briefed are abandoned).

8

Dupree's statutory argument presents a question of law subject to unlimited review. *State v. Vaughn*, 288 Kan. 140, 143, 200 P.3d 446 (2009) ("[T]he computation of days to be assessed against the so-called speedy trial clock—requires some level of statutory interpretation and thus is reviewed de novo."); *State v. Adams*, 283 Kan. 365, 368, 153 P.3d 512 (2007) (same).

We begin with the statutory language upon which Dupree bases his claim. Under K.S.A. 22-3402(1):

> "If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, *unless the delay shall happen as a result of the application or fault of the defendant . . . .*" (Emphasis added.)

The State bears the responsibility to ensure a defendant is afforded a speedy trial in compliance with K.S.A. 22-3402; a defendant does not need to take any affirmative action to ensure a speedy trial. *Adams*, 283 Kan. at 369. Arraignment triggers the State's obligation to bring a defendant to trial within the statutory limits. *State v. Sievers*, 299 Kan. 305, 307, 323 P.3d 170 (2014). Dupree's arraignment occurred on February 6, 2012. So the State had 90 days from that date to bring Dupree to trial. The original date for Dupree's trial was April 2, 2012, which amounted to a period of 56 days chargeable to the State. From that point, except a period of 14 days, all continuance requests came from the defense.

Under the plain language of this statute, a continuance resulting from a defense request stays the statutory speedy trial calculations. *Vaughn*, 288 Kan. at 151. Dupree does not dispute that his defense attorney requested continuances, and, generally,

9

"defense counsel's actions are attributable to the defendant." *State v. Bloom*, 273 Kan. 291, 310, 44 P.3d 305 (2002).

One exception to this general rule is relevant in Dupree's case:  We have recognized for speedy trial purposes that an attorney cannot continue a case over a defendant's objection. See *State v. Hines*, 269 Kan. 698, 704, 7 P.3d 1237 (2000); see also *Vaughn*, 288 Kan. at 144 (defense counsel's actions attributable to defendant "unless the defendant timely voices" disagreement); *State v. Arrocha*, 30 Kan. App. 2d 120, 126, 39 P.3d 101, *rev. denied* 273 Kan. 1037 (2002) (Essentially, *Hines* created "a unique exception [to the rule attributing defense counsel's actions to defendant] for circumstances when defense counsel and the defendant openly disagree about setting a trial date beyond the statutory time limit."). Dupree claims he was not consulted about the continuances and never acquiesced to any continuance.

In addition, we recently confirmed a defendant must have an opportunity to be present to express disagreement with a continuance because a defendant's disagreement matters in the statutory speedy trial analysis. See *State v. Brownlee*, 302 Kan. 491, 508, 354 P.3d 525 (2015) (agreeing that a defendant should be present at a hearing on a defense motion to continue); see also K.S.A. 2014 Supp. 22-3208(7) (stating defendant's right to be present at a motion hearing); *State v. Taylor*, No. 104,455, 2011 WL 3795481, at *4 (Kan. App. 2011) (unpublished opinion) (discussing *Hines* and *Arrocha* and recognizing that "[a] criminal defendant must be afforded a reasonable opportunity to object to a continuance affecting his or her speedy trial rights"). Accordingly, Dupree's claim, if true, could indicate his right to a speedy trial was violated because he never personally waived his statutory right.

10

Even if defense counsel did not consult with Dupree, Dupree may not be entitled to relief under the majority holding in *Brownlee*, which interpreted and applied 2012 amendments to K.S.A 22-3402. As of July 1, 2012:

> "If a defendant, or defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant regardless of the reasons for making the request, unless there is prosecutorial misconduct related to such delay. If a delay is initially attributed to the defendant, *but is subsequently charged to the state for any reason, such delay shall not be considered against the state under subsection*[] *(a) . . . and shall not be used as a ground for dismissing a case or for reversing a conviction* unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay." (Emphasis added.) K.S.A. 2014 Supp. 22-3402(g).

In *Brownlee*, the members of this court disagreed about whether the first sentence of subsection (g) sets up a precondition for application of the second sentence. The dissenters concluded the first sentence defines and limits the circumstances under which the second sentence can operate. 302 Kan. at 526 (Luckert, J., dissenting; Johnson, J., joining). Under that view, Dupree would be entitled to relief because he did not request, and his attorney did not consult with him before requesting, the delays at issue.

That view did not prevail, however, and a majority of this court held the two sentences in subsection (g) are not "contingent upon each other." Rather, "[t]he second sentence is much broader in its application. It involves situations where 'a delay is initially attributed to the defendant[ ] but is subsequently charged to the state for *any reason . . . .*' (Emphases added.) K.S.A. 2012 Supp. 22-3402(g)." 302 Kan. at 510. That holding, if it retroactively applies to Dupree's case, controls—because Dupree does not dispute the State's assertion that the language of the second sentence of subsection (g) means he is not entitled to dismissal. Indeed, the sentence fits:  The district court initially

11

attributed the delays to Dupree and, even if further investigation into Dupree's claim resulted in those delays being charged to the State, the second sentence of K.S.A. 2014 Supp. 22-3402(g) leaves us with no grounds to reverse Dupree's convictions and dismiss the case against him. "Under subsection (g), the legislature, which created the statutory right [to speedy trial], has decided to eliminate the remedy for its violation in certain circumstances." *Brownlee*, 302 Kan. at 511.

The question remains, however, whether the newly amended version of K.S.A. 22-3402 applies to this case. At Dupree's February 6, 2012, arraignment, K.S.A. 22-3402 did not contain subsection (g). Subsection (g) first appeared in K.S.A. 2012 Supp. 22-3402, which became effective July 1, 2012. We recently held in *Brownlee* that "K.S.A. 2012 Supp. 22-3402(g) is a procedural provision, and it can be retroactively applied to [a defendant's] case." 302 Kan. at 509-10.

In an attempt to distinguish his case from *Brownlee*, Dupree argued in a letter of additional authority that, unlike *Brownlee*, the time limit for his statutory speedy trial right had expired prior to the effective date of K.S.A. 2014 Supp. 22-3402(g). In *Brownlee*, the 90-day time limit expired on December 11, 2012—after the July 1, 2012, date on which subsection (g) became effective. Here, the State's 90 days expired on May 6, 2012—before the July 1, 2012, effective date. As discussed below, that distinction does not matter because Dupree did not have a vested right to dismissal of charges as of May 6, 2012.

Essentially, Dupree contends that the expiration of the statutory speedy trial time limit provided him with a "vested" right to dismissal, meaning he was entitled to dismissal and subsection (g) and *Brownlee's* interpretation of it could not retroactively apply to his case. Certainly, "[e]ven where the legislative intent is clear, courts must still

12

consider whether retrospective application of legislation will affect *vested* or substantive rights." (Emphasis added.) *Owen Lumber Co. v. Chartrand*, 276 Kan. 218, 220-21, 73 P.3d 753 (2003).

A vested right is one "so fixed that it is not dependent on any future act, contingency or decision to make it more secure." *Board of Greenwood County Comm'rs. v. Nadel*, 228 Kan. 469, 474, 618 P.2d 778 (1980). Initially, we do not view Dupree's speedy trial claim as fitting the definition of a vested right because a defendant ordinarily can only obtain relief under the speedy trial statute by (1) asserting the claim at the district court level and winning or (2) losing the claim at the district court level, appealing, and then persuading a future appellate court to reverse the district court's findings of fact. See *State v. Crawford*, 46 Kan. App. 2d 401, 408-09, 262 P.3d 1070 (2011) (recognizing that a speedy trial claim is waived if not raised before the district court). But see *State v. Adams*, 283 Kan. 365, 368, 153 P.3d 512 (2007) (court *sua sponte* raised speedy trial issue on appeal under the unusual circumstances of the case). In other words, dismissal of Dupree's case depended on both his own future acts and other contingencies.

Although Dupree's claim does not seem to fit the general definition of a vested right, and even though there are no similar exceptional circumstances in this case, we do not reject his argument out of hand in light of *Adams*. Also, further consideration seems warranted since we have recognized that the concept of vested rights is inherently difficult to define and apply. See *Owen Lumber*, 276 Kan. at 221 (citing *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 364-65, 892 P.2d 497 [1995], and discussing the difficulty in defining a "vested right" and applying the concept). Likewise, in *Owen Lumber*, we set out three factors to be considered in determining whether a statute deals with a vested right:

13

"'(1) the nature of the rights at stake (*e.g.*, procedural, substantive, remedial), (2) how the rights were affected (*e.g.*, were the rights partially or completely abolished by the legislation; was any substitute remedy provided), and (3) the nature and strength of the public interest furthered by the legislation.'" 276 Kan. at 222.

Typically, the concept of vested rights has been discussed by this court in the context of civil cases, such as *Owen Lumber*, which involved legislation that sought to retroactively eradicate a mechanics lien. 276 Kan. at 227-28. Although less frequently, at least some discussion of vested rights has appeared in criminal cases. See, *e.g.*, *State v. Hunt*, 198 Kan. 222, 226-27, 424 P.2d 571 (1967); *State v. Montgomery*, 34 Kan. App. 2d 511, 515-16, 120 P.3d 1151 (2005); see also *State v. McDaniels*, 237 Kan. 767, 770, 703 P.2d 789 (1985) ("'The right to an appeal is neither a vested nor constitutional right, but is strictly statutory in nature. It may be limited by the legislature to any class or classes of cases, or in any manner, or it may be withdrawn completely.'").

One case from the Court of Appeals, *In re Care & Treatment of Hunt*, 32 Kan. App. 2d 344, 82 P.3d 861 (2004), presented an issue similar to Dupree's, although it arose as a civil matter in the context of the Sexually Violent Predator Act (SVPA). *In re Hunt* involved individuals committed to the SVPA treatment program who argued they were entitled to discharge because their trials did not begin within 60 days of a probable cause hearing, as required by statute. Prior caselaw had labeled the 60-day statutory limit as jurisdictional; but in response to that caselaw, the legislature amended a statute to make clear that the 60-day period was not jurisdictional and that violation of the 60-day period should not result in discharge. Like here, the question becomes whether the amendment retroactively applied. The *In re Hunt* court applied the *Owen Lumber* factors to determine whether the legislature sought to retroactively remove an individual's vested right to discharge. 32 Kan. App. 2d at 362.

14

On the first *Owen Lumber* factor—the nature of the rights at stake (procedural, substantive, or remedial), *In re Hunt* cited precedent from this court noting that the 60-day limit was similar to a statute of limitations or criminal speedy trial provision. 32 Kan. App. 2d at 363 (citing *In re Care & Treatment of Searcy*, 274 Kan. 130, 142, 49 P.3d 1 [2002] ["The mandatory language of K.S.A. 2001 Supp. 59-29a06 is analogous to the statutory right to speedy trial in criminal cases"]). Because a statute of limitations can be waived, lost, or extended by statute, it does not typically create a vested right. *In re Hunt*, 32 Kan. App. 2d at 363-64. But see *State v. Noah*, 246 Kan. 291, 294-95, 788 P.2d 257 (1990) (noting procedural nature of statute of limitations but once expired the limitations cutoff provides a vested and complete defense; holding legislature cannot amend a criminal statute to lengthen the period after it has expired). That is in contrast to a statute of repose, which is substantive because it "abolishes the cause of action after the passage of time even though the cause of action may not have yet accrued." *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, 668, 831 P.2d 958 (1992); see also *Owen Lumber*, 276 Kan. at 223 (noting distinction between statute of limitations and statute of repose); *In re Hunt*, 32 Kan. App. 2d at 364 (same).

The *In re Hunt* court found this first factor to be in equipoise. It noted that prior cases had treated the 60-day limit as jurisdictional, which was more like a substantive statute of repose. The court also recognized, however, that the 60-day limit could be waived and extended, much like the more procedural statute of limitations. 32 Kan. App. 2d at 364.

Here, in contrast, the speedy trial statute weighs heavily on the procedural side. Indeed, rather than establishing a new substantive right, the speedy trial statute is merely a procedure that works to protect an existing substantive right:  "The purpose of K.S.A.

15

22-3402 is to implement the accused's constitutional right to a speedy trial. It is the State's obligation to insure that an accused is provided a speedy trial." *State v. Green*, 252 Kan. 548, 550, 847 P.2d 1208 (1993). The speedy trial statute is not a "substantive criminal law, which either defines a crime or involves the length or type of punishment." *State v. Sutherland*, 248 Kan. 96, 106, 804 P.2d 970 (1991). Rather, the speedy trial statute is procedural because it "provides or regulates the steps by which one who violates a criminal statute is punished." *State v. Hutchison*, 228 Kan. 279, 287, 615 P.2d 138 (1980); see *Easterwood v. State*, 273 Kan. 361, 372, 44 P.3d 1209 (2002).

The speedy trial statute puts an obligation on the State to bring a person to trial within 90 days; it regulates how the State goes about punishing a person for violating a criminal statute. Because the legislature enacted the speedy trial statute as a procedural mechanism to protect a substantive constitutional right, the statutory speedy trial time limit has long been subject to a number of exceptions: It can be extended as a result of a defendant's delay, for a defendant's incompetence, because of the unavailability of material evidence, because of a crowded court docket, or as a result of actions on appeal. See K.S.A. 22-3402(2), (5). Thus, we conclude the first factor weighs in favor of retroactive application of a nonvested right. See *State v. Williams*, 291 Kan. 554, 557, 244 P.3d 667 (2010) (procedural rule typically operates retroactively unless it prejudicially affects the substantive rights of a party), *overruled in part on other grounds State v. Keel*, 302 Kan. 560, 357 P.3d 251 (2015).

As to the second *Owen Lumber* factor—how the right was affected— the *In re Hunt* court noted that a person facing commitment had a complete defense prior to the SVPA statute amendments. There, retroactively applying the statute completely abolished the defense without providing any substitute remedy. 32 Kan. App. 2d at 364; see also *Noah*, 246 Kan. at 294-95 (criminal statute of limitations, once expired, cannot be

16

retroactively lengthened because it abolishes a complete defense). Here, for two reasons, the 2012 amendments to the speedy trial statute do not affect the right as severely as the *In re Hunt* statute.

First, K.S.A. 2014 Supp. 22-3402(g) only removes the remedy for a statutory speedy trial violation and does so in only some circumstances, stating: "If a delay is initially attributed to the defendant, but is subsequently charged to the state for any reason, such delay . . . shall not be used as a ground for dismissing a case or for reversing a conviction." Granted, removal of the remedy in those limited circumstances undercuts the statutory right, but "the general rule is that there are no vested rights in a particular remedy or method of procedure." *Owen Lumber*, 276 Kan. at 222; see also *McDaniels*, 237 Kan. at 770 (right to appeal is neither vested nor constitutional). Second, the statute does not affect the statutory remedy in circumstances not covered by subsection (g) and preserves a remedy even under subsection (g) for a constitutional speedy trial violation, which we have said is the ultimate objective of the statute, or if there has been prosecutorial misconduct. K.S.A. 2014 Supp. 22-3402(g) (no dismissal or reversal of conviction on appeal "unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay"). Unlike in *In re Hunt*, the statutory speedy trial defense is not completely abolished.

The third *Owen Lumber* factor—the nature and strength of the public interest furthered by the legislation—weighed heavily in favor of retroactivity in *In re Hunt*. "The public has an enormous interest in seeing that persons who qualify as sexually violent predators are removed from society and treated in appropriate facilities." Ultimately, the *In re Hunt* court found that the factors (particularly the public's interest) tipped the scale

17

towards retroactive application, meaning the SVPA committees did not have a vested right to discharge. 32 Kan. App. 2d at 364-65.

Here, too, we find the third factor weighs heavily in favor of finding a nonvested right. The legislature restricted the defendant's remedy only under limited circumstances: when an initial decision attributing a delay to the defendant is reversed and charged to the State. Whether this reversal occurs at the district court or appellate level, it likely happens due to some factual or legal error. Notwithstanding the speedy trial statute as it was worded before the amendments at issue, in other contexts, only rarely does such a judicial error result in the outright dismissal of a case.

Rather, the Kansas Legislature has generally directed that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." K.S.A. 2014 Supp. 60-261; see K.S.A. 60-2105 (criminal conviction typically will be reversed only when an error "ha[s] prejudicially affected the substantial rights of the party complaining"); *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (test under 60-261 is whether "there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record"). Thus, the previous language of the speedy trial statute created an extraordinary remedy for judicial error somewhat at odds with general legislative policy. Subsection (g) merely limits the reach of that extraordinary remedy. Indeed, subsection (g) specifically preserves the remedy for a constitutional speedy trial violation, *i.e.*, when substantial rights are prejudiced.

Properly attributing the delay leads to a correct application of the speedy trial statute and does not affect any party's substantial rights. See 2014 Supp. K.S.A. 60-261. The current statute still serves its fundamental purpose of expeditiously resolving

criminal matters because the State still has an obligation to bring a defendant to trial within the time frames of statutory speedy trial. To be sure, if the district court correctly attributes delays and the State fails to bring a defendant to trial within the statutory limits, the district court must dismiss the case. The amendment furthers the social interest of seeing that those accused of crimes are both prosecuted and given a fair trial by limiting the extraordinary remedy of dismissal and making it inapplicable to judicial errors that would otherwise not affect substantial rights. See, *e.g.*, K.S.A. 2014 Supp. 60-261. In other words, the third factor suggests Dupree did not have a vested right.

Thus, the speedy trial statute does not create a vested right; K.S.A. 2014 Supp. 22-3402(g) is procedural and retroactively applies to Dupree's case. Because we cannot grant Dupree any relief for his alleged statutory speedy trial claim, we do not decide whether the district court was wrong to attribute the delays against Dupree given that Dupree does not suggest his constitutional rights were violated or that the delays resulted from prosecutorial misconduct. See K.S.A. 2014 Supp. 22-3402(g); *Brownlee*, 302 Kan. at 511.

ISSUE 2: *The district court properly overruled Dupree's* Batson *challenge*.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "applies to the State's privilege to strike prospective jurors through peremptory challenges." *State v. Kettler*, 299 Kan. 448, 461, 325 P.3d 1075 (2014). We use a three-step analysis in recognition of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), when considering a challenge that the State exercised its peremptory strikes based on purposeful racial discrimination. See *Kettler*, 299 Kan. at 461; *State v. Hood*, 242 Kan. 115, 122-23, 744 P.2d 816 (1987). A distinct standard of review governs each step of the analysis:

"First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. [Citation omitted.]

"Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. [Citation omitted.]

"Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. '[U]sually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard.' [Citations omitted.]" *Kettler*, 299 Kan. at 461-62.

A district court abuses its discretion when it makes a decision that is based on an error of law or fact; or when it makes a decision that is otherwise arbitrary, fanciful, or unreasonable. *State v. Wilson*, 301 Kan. 403, 405, 343 P.3d 102 (2015).

The parties here do not contest that there was a prima facie showing that the State exercised a preemptory challenge on the basis of race. Rather, they focus on whether the district court (1) erred in finding that the State had articulated a race-neutral reason for striking two African Americans, D.W. and K.B., and (2) abused its discretion in concluding that Dupree had not established purposeful discrimination. Neither argument is persuasive.

20

Turning first to D.W., the State claimed it struck her because her answers about felony murder were troubling. During voir dire, the prosecutor spoke about the concept of felony murder, explaining a person can be guilty of murder even without pulling the trigger. D.W. said she would have a problem finding someone guilty of murder if he or she were not the person directly responsible for the murder. But she said she understood that she would have to follow the law, and she conceded she would not break her oath as a juror. However, she also told the prosecutor to "[t]ake somebody else" because she could not "morally and conscientiously" convict someone for felony murder. The next day, the defense attempted to rehabilitate D.W. Again, D.W. expressed her disapproval of the concept of felony murder. But she did reiterate that she would follow the law, even if she did not want to, and would not break her oath.

The State carries a relatively low burden to provide a race-neutral reason for a strike—the justification must be facially valid, but it need not necessarily be plausible or persuasive. *Kettler*, 299 Kan. at 462. Here, our review of the record reveals that the State's reason was more than facially valid; it was plausible and persuasive. D.W. told the prosecutor she could not morally convict someone of felony murder. She later told the defense, reluctantly and somewhat to the contrary, that she would follow the law regarding felony murder even if she did not agree with it. Regardless of which of these competing principles D.W. would ultimately follow, we agree that D.W.'s hesitation provided the State with a race-neutral reason to strike her from the jury panel. Moreover, the State also struck two other jurors, who were not African American, for the same reason. See *Angelo*, 287 Kan. at 274 (a court can consider whether State struck white potential jurors for the same reason as an African American). Thus, we conclude the district court did not abuse its discretion in finding no purposeful discrimination as to D.W.

Turning to K.B., the prosecutor remembered him from a prior case—K.B.'s girlfriend had been a witness. Additionally, K.B. revealed he was a self-employed co-owner of a barbershop. When the defense asked if missing work for a week to serve on a jury would hurt him financially, K.B. replied, "It will be a challenge, but I'll get through it." Later, the State used a peremptory strike on K.B., resulting in Dupree's *Batson* challenge.

The State responded with several race-neutral reasons. First, it noted that after the conclusion of voir dire, K.B. had contacted the court assistant and disclosed that he thought he graduated with Dupree or at least had a class with him—something K.B. did not mention during voir dire. Second, the prosecutor remembered K.B. from the prior case because K.B. and his girlfriend were evasive as witnesses. Third, the prosecutor noted that as a self-employed person it would be hard, financially, for K.B. to serve on a jury trial that was likely to span a week.

Concerned about K.B.'s post-voir dire disclosure that he might know Dupree, the court called K.B. into chambers. K.B. told the court that it had just occurred to him the previous night that he might know Dupree. He claimed his knowledge of Dupree would not make him biased. Before leaving chambers, K.B. added that he also knew two Wichita police officers. K.B. did not explain why he waited to disclose this information. Indeed, the panel of potential jurors during voir dire answered questions about both their knowledge of Dupree and their relationships with police officers.

In response to the State's reasons for its strike, Dupree said he did not remember K.B. from school, and the defense argued K.B. had been forthcoming. Nonetheless, the court found K.B. to be less than forthcoming in his answers to voir dire questions. The

22

court also found the State's reasons were race-neutral and that Dupree had not shown purposeful discrimination.

This left two African Americans on the panel—the defense struck one, and the other was selected as the alternate juror. Although not determinative, the court can consider that other members of the same race as the defendant were not struck. *Angelo*, 287 Kan. at 274.

On appeal, Dupree primarily argues that the district court abused its discretion as to K.B. by providing its own reason to strike K.B. rather than by accepting the State's proffered race-neutral reasons. We are not persuaded by Dupree's argument because it is premised on an unfair reading of the record.

A district court resolves a *Batson* challenge by ultimately determining if the attorney exercising the peremptory strike did so for legitimate or discriminatory ends. Likewise, the decision rests heavily on an assessment of the credibility and demeanor of the challenging attorney. Appellate courts give significant deference to those sorts of credibility findings. *Angelo*, 287 Kan. at 272; see *State v. Brooks*, 297 Kan. 945, 951, 305 P.3d 634 (2013) ("appellate court[s] will not determine the credibility of witnesses"). Here, one of the prosecutor's race-neutral reasons was that he knew K.B. and believed him to be evasive and less than forthcoming. Notably, this court has affirmed peremptory strikes based on lesser reasons like body language and a prosecutor's intuition. *Angelo*, 287 Kan. at 274-75.

In this case, it so happened that the district court did not have to rely solely on the prosecutor's subjective beliefs about K.B.'s nature. The district court was able to judge whether K.B. had been forthcoming during voir dire when he came forward with directly

relevant information after voir dire had ended. Contrary to Dupree's claim, the district court did not generate its own reason when it expressed its concern over K.B.'s inexplicably delayed disclosure of information. More accurately, the court provided a bit of explanation why, under the circumstances, it found one of the State's race-neutral reasons appropriate.

Furthermore, the case Dupree cites, *Paulino v. Castro*, 371 F.3d 1083 (9th Cir. 2004), to support his argument is distinguishable. There, the defense raised a *Batson* challenge but, before the defense could finish explaining the reasons for its challenge, the district court interrupted with speculation about why the prosecutor exercised peremptory strikes. The court never gave the prosecutor a chance to explain its strikes, which clearly contravened the steps of the *Batson* analysis. See also *State v. Knighten*, 51 Kan. App. 2d 417, 424, 427, 347 P.3d 1200 (2015) (district court told parties it was "'not asking for a race, gender or any kind of neutral explanation at this point,'" resolving the matter with "its own notes and experiences . . . without first requiring the State to produce race-neutral reasons"). Indeed, the crux of a *Batson* analysis is whether the State's actual reason for a strike is discriminatory. So it is error to fail to provide the State with an opportunity to explain its reason even if the court can come up with a good reason why the State might have justified the strike. *Paulino*, 371 F.3d at 1089-90. This simply did not happen here.

Here, the record is clear that the district court found a prima facie case, asked for and considered the State's reasons for the strikes, and in light of those reasons ultimately concluded that Dupree failed to prove purposeful discrimination. The district court did not abuse its discretion in overruling Dupree's *Batson* challenges.

ISSUE 3: *Dupree failed to preserve an issue regarding the voluntariness of his statements during a postarrest custodial interview*.

Next, Dupree argues the district court should have suppressed a statement he made during a custodial interview after Dupree was first arrested. He specifically focuses on his admission to making the following statement to Stuart's sister over the phone: "Just like that slob nigga about got done, you and your boyfriend going to get done."

After a pretrial hearing, the district court concluded this admission was admissible. On appeal, Dupree argues his admission was involuntary, and thus inadmissible, for two reasons. First, he claims the interviewing officer deceived him into admitting that he made the above statement to Stuart's sister. Second, he argues his admission was involuntary under *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), and that the State failed to prove otherwise. We conclude Dupree failed to preserve these arguments for our review because he did not lodge a timely objection to the evidence regarding his admission before the district court.

Generally, to preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial. K.S.A. 60-404; *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). Even when the district court rules on the admissibility of evidence pretrial, a party must still make an objection at trial before the admission of the evidence because the unfolding of a case may require a reevaluation of the reasons for the initial ruling. *State v. Richard*, 300 Kan. 715, 720-21, 333 P.3d 179 (2014).

Here, Dupree did not object at any point during the testimony of the interviewing detective who told the jury that Dupree admitted to having made the phone call (1) because he was angry and (2) with the understanding that his statement could be taken

25

as a threat. Instead, in a recess following the testimony, Dupree's counsel asserted he had "two continuing ongoing objections to these statements . . . based on the previous motions we argued."

Now, on appeal, Dupree claims the district court granted him a continuing objection during the pretrial ruling on admissibility. However, the record reflects that Dupree's counsel never requested a continuing objection during the pretrial hearing. The colloquy following the ruling on voluntariness proceeded as follows:

> "[DEFENSE COUNSEL]: And I presume that the Court's going to give me leave to object *at the time when these statements are coming out* and state something to the matter of for the reasons previously argued or something like that?

> "THE COURT: I will allow you to make your record to—to the extent that we don't go back and start arguing what we've already argued here this morning.

> "[DEFENSE COUNSEL]: Sure. Understood." (Emphasis added.)

Despite defense counsel's request to make a contemporaneous record during trial when the statements were admitted into evidence, counsel did not contemporaneously object during the lengthy direct examination in which the statements came into evidence. He objected only during a recess after the jury already heard the evidence.

The State is correct that Dupree never lodged a timely objection, which leaves his argument about voluntariness unpreserved for appeal. See *Richard*, 300 Kan. at 720-21.

ISSUE 4:  *The district court did not abuse its discretion by admitting photographs.*

Dupree next argues the trial court erred in admitting certain photographic exhibits on the basis that the photographs were gruesome, duplicative, and meant to ignite the jury's sympathies. Specifically, Dupree challenges the admission of three groups of photos on appeal:  emergency room photos, autopsy photos, and crime scene photos. We find no error in the admission of the photographic evidence.

At the outset, Dupree concedes that photographs of the extent, nature, and number of wounds are usually relevant in murder trials. *State v. Hickles*, 261 Kan. 74, 85, 929 P.2d 141 (1996) (citing *State v. McCorgary*, 224 Kan. 677, 681, 585 P.2d 1024 [1978]). Nevertheless, he argues the district court abused its discretion in admitting the photos in this case. We find no merit in his various arguments.

Dupree first challenges the relevancy of photographs of Phillips' emergency room treatment. The test for relevancy is whether the evidence has "any tendency in reason to prove any material fact." K.S.A. 60-401(b); *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). This definition requires the evidence to be material and probative. Evidence is material when the fact it supports is in dispute or in issue in the case. Review for materiality is de novo. 299 Kan. at 348. Evidence is probative if it has any tendency to prove any material fact. *State v. Lowrance*, 298 Kan. 274, 289, 312 P.3d 328 (2013). Appellate courts review the district court's assessment of the evidence's probative value under an abuse of discretion standard. *State v. Huddleston*, 298 Kan. 941, 960, 318 P.3d 140 (2014).

As to materiality, photographs showing the jury the manner of death are material in a murder trial. See *State v. Backus*, 295 Kan. 1003, 1013, 287 P.3d 894 (2012). Here, the photographs are probative of this material fact in that they show the manner of

Phillips' death—a gunshot to his head, and the unfortunately unsuccessful attempt to save his life. Moreover, it was Dupree who, through cross-examination, suggested that not enough was done to save Phillips' life. When a defendant discusses an area of evidence that would otherwise be forbidden the State can respond by presenting evidence in that formerly forbidden area. See *State v. Everett*, 296 Kan. 1039, 1044, 297 P.3d 292 (2013). So even if the emergency room photographs were for some reason initially irrelevant, the State here properly presented the photographs to the jury as a rebuttal to Dupree's suggestion that no one tried to save Phillips.

Based on our de novo review of the record, we hold that the emergency room photographs were material and that the district court did not abuse its discretion in weighing the probative nature of the photographs. See *Bowen*, 299 Kan. at 348.

Dupree next challenges the autopsy photographs. At its core, Dupree's argument attacks the relevance and the cumulative nature of the photographs.

As to relevance, "photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death." *State v. Verge*, 272 Kan. 501, 515, 34 P.3d 449 (2001). In Dupree's trial, the coroner testified about the gunshot wound to Phillips' head and concluded that it was the cause of his death. The district court correctly determined the photographs were relevant.

In arguing about the cumulative nature of the autopsy photographs, Dupree suggests one photograph rather than four was sufficient, noting that the coroner did not even need to reference some of the photographs. As we explained in *Hickles*, 261 Kan. at 88: "Cumulative evidence is evidence of the same kind to the same point, and whether it

is cumulative is to be determined from its kind and character, rather than its effect." A district court may in the exercise of discretion refuse to admit cumulative evidence. 261 Kan. at 88; see also *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012) (on appeal, abuse of discretion standard applies to cumulative error complaint).

Here, each of the photographs corroborated the coroner's testimony by showing Phillips' body at different angles and distances. As we said in *State v. Rodriguez*, 295 Kan. 1146, 1158, 289 P.3d 85 (2012), the photographs depicted the "injuries in a way that [the coroner's] mere words could not. In this way, they had additional relevance. In addition, they were not repetitious of each other, because each was taken from a different angle."

Finally, Dupree challenges the crime scene photos and again argues the photos were cumulative. However, the detective testified that she tried to get a panoramic view of the kitchen where Phillips was shot "the hard way" with single camera shots. Further, the photos served to corroborate Stuart's and the detectives' testimony about the circumstances of Phillips' murder. *Verge*, 272 Kan. at 515.

Rarely has this court found an abuse of discretion in the admission of photographic evidence in a murder trial; here too, we conclude the district court did not abuse its discretion in admitting the photos.

ISSUE 5: *The cumulative effect of errors in Dupree's case does not require reversal of his convictions.*

Dupree argues this court must reverse his convictions because multiple trial errors, considered together, resulted in an unfair trial. Cumulative trial errors can require the reversal of a conviction if the totality of the circumstances substantially prejudiced the

defendant and resulted in an unfair trial. *State v. Burns*, 295 Kan. 951, 960, 287 P.3d 261 (2012), *overruled in part on other grounds State v. King*, 297 Kan. 955, 305 P.3d 641 (2013). If there is no error or only a single error, however, there is no error to accumulate and no basis to reverse a conviction. See *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012). We do not find any errors in Dupree's case, however. At most, we assume a possible violation of the speedy trial statute, although we conclude Dupree does not have a right to a remedy. Because there is only one assumed error, there are no errors to accumulate.

Affirmed.