NOT DESIGNATED FOR PUBLICATION

No. 123,226

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES CIPRA,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed January 7, 2022.
Affirmed in part, reversed in part, and vacated in part.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.


Before ARNOLD-BURGER, C.J., MALONE, J., and JAMES L. BURGESS, S.J.


PER CURIAM: James Cipra appeals his convictions of 10 counts of rape of a child under the age of 14, arguing that the district court erred by allowing the State to present character evidence at trial and that there was insufficient evidence to support his convictions. After reviewing the record, we find Cipra failed to preserve a challenge to the admission of the character evidence by making a contemporaneous objection at trial. But we find there was sufficient evidence to support only one rape conviction. Thus, we reverse the remaining convictions and vacate his sentences on those counts, but we otherwise affirm the district court's judgment.

1

This case involves allegations of sexual misconduct involving Cipra and his victim, A.C., that were not made until a few years after the offenses happened. In 2017, the State charged Cipra with two counts of aggravated indecent liberties with a child, both off-grid person felonies. A.C.'s mother, T.C., reported to law enforcement that A.C., then 9 years old, stated she was "molested" by Cipra when she was younger. The complaint alleged that these two offenses occurred "on or between the 8th of November, 2011 A.D. and the 7th of November, 2012 A.D.," when A.C. was 4 years old, and "on or between the 8th of November, 2012 A.D. and the 7th of November, 2013 A.D.," when A.C. was 5 years old.

After the district court held a preliminary hearing, the State filed an amended information adding 10 counts of rape, off-grid person felonies, and 11 counts of sexual exploitation of a child, nondrug person felonies. The amended information alleged that these offenses occurred between November 2011 and November 2013, when A.C. was between three to five years old.

Before trial, Cipra filed a motion in limine, asking the district court to allow the State to admit evidence of his prior bad acts only if he introduced evidence of his good character. Cipra also asked the district court to admit such evidence only if it showed his honesty or veracity. Cipra mentioned his "prior criminal history, . . . prior police contact, . . . prior use of drugs or alcohol, and . . . friendships or associations with known criminals" as inadmissible prior bad acts evidence.

The trial occurred in July 2019, and three witnesses testified on the State's behalf: A.C., T.C., and Captain Patricia Giordano, the officer who interviewed A.C. and T.C.

The first witness was A.C., who testified that she lived in Wichita with her family when she was between the ages of four and six. They later moved to Junction City. She remembered going on a walk with T.C. at some point in Junction City and told T.C. that Cipra had "molested" her. A.C. said she decided to tell her mom because "I didn't want to keep it a secret anymore."

A.C. testified that Cipra touched the inside of her vagina with his penis and described it as feeling "terrible" and "like I was doing something wrong." Cipra also touched her shoulder blades with his hands and told A.C. to take her clothes off. This occurred in T.C.'s bedroom at their house in Wichita. A.C. said her sister was at home then but not in the room. A.C. could not remember if Cipra was looking at anything when he told her to take her clothes off. A.C. said one thing she could remember feeling is that his penis "felt slimy." She also could not stop thinking about "[w]hy he did it." She said, "I think it happened more than one time, but I'm not quite sure." A.C. said she did not remember telling a detective that it happened about 10 times.

Captain Giordano, who was a lieutenant on patrol in Junction City at the time of the allegations, testified that she was called to help interview A.C. When Giordano began the interview, all she knew was that A.C. had disclosed she had been "inappropriately touched" by Cipra. Giordano's only involvement with the case was interviewing A.C. and her sister, and then the Junction City Police Department referred the case to the Wichita Police Department because the crimes occurred there.

A video recording of the interview was admitted at trial and published for the jury. When Giordano asked A.C. if she knew why she was there, A.C. responded that "[Cipra] did something bad to me." A.C. said it happened in T.C.'s bedroom in Wichita. She remembered the first time it happened sitting down on the bed while Cipra was laying there under the covers staring at his computer. A.C. said Cipra was watching "pretty ladies" on the computer. Giordano asked A.C. what happened, and A.C. responded that

3

Cipra told her to take off her pants and underwear and he made her do it. A.C. then used anatomical dolls to show Giordano that he put his penis in her vagina, and A.C. said sometimes pee came out of his penis when he did this to her. A.C. said it eventually stopped happening after she turned six. A.C. believed it happened "about 10 times."

A.C. also stated in the video recording that the night before she told her mom, they were talking about feelings and "it felt like it was finally time to mention it," but then Cipra walked in the room and A.C. "didn't feel safe mentioning it" so she stopped talking. A.C. said she was "like 4 to 6" years old at the time. She said it happened "more than one time." A.C. remembered that it always occurred during the day when her mom was not at home because she was working or some other place A.C. did not know. A.C.'s sister was at home as well but doing something else.

T.C. testified she first met Cipra around December 2002 or January 2003. At that time, they lived in Manhattan and eventually moved to Wichita in May 2010. According to T.C., about a month to three months into their relationship, Cipra revealed to her, "[Y]ou're going to hate me, because I am attracted to children." She understood that to mean it was a sexual attraction. Cipra's statement "didn't come off as creepy," but as more of a "deep-felt, you're going to hate me and I kind of despise this about myself." T.C. said she consoled him and said, "[I]t's okay to be attracted, just never act on it," and that she did not hate him.

T.C. also said there were conversations where Cipra "defended smaller kids, or people that were under [the] age of consent, initiating sexual content." T.C. recalled Cipra saying that "should be fine," and that "it shouldn't always be frowned upon." T.C. told him these beliefs were not appropriate. T.C. also recalled Cipra saying he was "looking forward" to watching a movie he had downloaded with "this skinny dipping scene with an eight year old in it."

T.C. testified that she was walking with A.C. to go play disc golf when A.C. "let me know that she had a bad experience when she was four." According to T.C., A.C. informed her that she had walked into T.C.'s bedroom while Cipra was watching pornography and touching himself. T.C. told the jury that she had seen Cipra masturbate with the computer before and it was familiar behavior to her. Cipra told A.C. to "come here," so she went in although she did not want to. Cipra told A.C. to take her pants off and she refused, but Cipra made her take her pants off anyway. T.C. said she made A.C. stop telling the story because "that's like past the point of acceptable." She asked A.C. "are you okay if we never live with [Cipra] ever again," to which A.C. said "yes." After that, T.C. went to Pawnee Mental Health and they contacted law enforcement.

T.C. also testified that Cipra had books when they lived in Wichita that depicted images of nude children. She said, "They seemed liked artistic depictions," but admitted that after learning about the sexual abuse she "realized that the books or movies and other things weren't satisfying [Cipra], and [A.C.] was still in harm's way." T.C. agreed that not all the images in the books were sexually explicit, but that some depicted "very young children and mostly in the nude." During T.C.'s testimony, the State introduced into evidence 11 books Cipra kept in the house in Wichita that depicted images of nude children.

After presenting its evidence, the State announced it was dismissing the aggravated indecent liberties charges and proceeding only on the rape and sexual exploitation of a child charges. Cipra moved for a judgment of acquittal on the remaining charges. Relevant to this appeal, Cipra argued there was no evidence presented of when the alleged rapes occurred or that there were 10 total incidents. The State responded that A.C. stated during the interview that the rapes occurred 10 times between the ages of four and six, so a prima facie case had been made to submit the charges to the jury. The trial court agreed with the State and denied Cipra's motion.

Cipra did not testify at the trial or present any evidence. During closing argument, his counsel argued that the State had failed to prove the charges beyond a reasonable doubt, focusing on the age of the allegations and the lack of physical evidence. Counsel questioned the credibility of both A.C. and T.C., pointing to inconsistencies in their statements. Finally, counsel argued that the books were not sexually explicit enough to support the sexual exploitation charges.

After deliberating, the jury returned a guilty verdict on the 10 counts of rape, but acquitted Cipra of the sexual exploitation of a child charges.

The day before sentencing, Cipra filed a written motion for a new trial and judgment of acquittal. The district court denied this motion at the start of the sentencing hearing. After also denying Cipra's motion for a durational and dispositional departure, the district court imposed the presumptive sentence of life in prison without the possibility of parole for 25 years on each of the 10 counts of rape. The district court ordered two of the counts to run consecutive to each other, with the other counts to run concurrent, for a total controlling sentence of life without the possibility of parole for 50 years. Cipra timely appealed the district court's judgment.

*Cipra failed to preserve his objection to the admission of character evidence by failing to object to its admission at trial.*

Cipra argues the trial court erred when it allowed the State to introduce evidence that Cipra once told T.C. he was "attracted to children." According to Cipra, allowing this evidence without first analyzing it as character evidence under K.S.A. 60-447 violated his due process rights and his right to a fair trial. He argues that T.C.'s testimony cannot be considered harmless where the only other evidence of his guilt was A.C.'s testimony.

6

But as the State points out, Cipra did not object at any point during T.C.'s testimony, nor did he ask the district court to analyze it as character evidence under K.S.A. 60-447. Alternatively, the State argues Cipra has not shown the evidence was inadmissible or that its inclusion was not harmless.

Cipra freely acknowledges that he failed to object below but asserts this court can consider the issue for the first time on appeal to serve the ends of justice or prevent the denial of his fundamental right to a jury trial. See *State v. Johnson*, 309 Kan. 992, 995, 331 P.3d 1036 (2019). But the Kansas Supreme Court has consistently declined to review evidentiary challenges like Cipra's without an objection at trial "even if the issue involves a fundamental right." *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010); see also *State v. Logsdon*, 304 Kan. 3, 28, 371 P.3d 836 (2016) (rejecting claim that exception applied to the erroneous admission of evidence with no timely or specific objection).

K.S.A. 60-404 provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decisions based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Based on this statute, a party must make a contemporaneous and specific objection to the admission of evidence to preserve the issue for appeal. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016); *State v. King*, 288 Kan. 333, 348-50, 204 P.3d 585 (2009) (stressing the importance of the requirement of an objection under K.S.A. 60-404). As a result, we will not address Cipra's challenge to the evidence because of his failure to make a timely and specific objection at trial.

7

*There was insufficient evidence presented to find Cipra guilty of 10 counts of rape.*

Cipra argues there was insufficient evidence to support his 10 rape convictions and asks us to reverse those convictions. The State responds that Cipra wants this court to reweigh the evidence, which it cannot do, and that the evidence supports his convictions.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

As Cipra acknowledges, the Kansas Supreme Court has long held that "[t]he testimony of the prosecutrix alone can be sufficient to sustain a rape conviction without further corroboration if the evidence is clear and convincing and is not so incredible and improbable as to defy belief." *State v. Plunkett*, 261 Kan. 1024, 1033, 934 P.2d 113 (1997). He contends A.C.'s testimony fails to meet this standard, arguing that A.C.'s testimony alone was not enough to find him guilty because she could not recall when the acts occurred and because of the lack of physical evidence. He claims A.C.'s testimony conflicted with the statements she gave during the interview and that A.C.'s statement that he raped her "about ten times" is too vague to sustain his 10 rape convictions.

There was sufficient evidence, viewed in the light most favorable to the prosecution, to support Cipra's conviction of one count of rape. A.C. testified at trial that Cipra told her to take her clothes off in the bedroom before touching the inside of her vagina with his penis. A.C. described how it felt "terrible" and "slimy" and that she could not forget it or stop thinking about why he did it. A.C.'s testimony about the incident was corroborated by the video of her interview with Giordano.

8

T.C. also corroborated A.C.'s testimony by explaining that A.C. disclosed during a walk that Cipra had "molested" her. T.C. recounted for the jury how Cipra had told her early in their relationship that he was "attracted" to children—which T.C. took to mean a sexual attraction—and that he made statements about children initiating sexual contact with adults as being "fine" or not "always frowned upon." T.C. also recalled Cipra saying he was "looking forward" to watching a movie he had downloaded with "this skinny dipping scene with an eight year old in it."

But we agree with Cipra that there was insufficient evidence to convict him of 10 separate counts of rape. At trial, A.C. only described one incident of rape. She identified a specific location—in T.C.'s bedroom in their house in Wichita—but she did not give a specific date. She testified, "I think it happened more than one time, but I'm not quite sure." T.C. only described being told by A.C. about one incident of rape. On the video recorded interview, A.C. told Giordano that the rape incident happened more than one time, but she did not know how many times. Later, in the video recording, A.C. said the incident happened "about 10 times." This statement was the only evidence presented to the jury to support a specific number of 10 incidents of rape. But at trial, A.C. testified that she did not remember telling a detective that it happened about 10 times.

In a sex crime case such as this one involving a child, it would have been typical for the State to charge the defendant with one count of rape and to prosecute the crime as a multiple acts case if there was more than one act to support the charge. But Cipra's case is the opposite of a multiple acts case. The State charged Cipra with 10 separate counts of rape based only on A.C.'s recorded statement that the incident happened "about 10 times." Likewise, the State charged Cipra with 11 separate counts of sexual exploitation of a child based on the evidence of 11 books he kept in the house depicting nude children.

We conclude there was insufficient evidence to support Cipra's conviction of 10 separate counts of rape based only on A.C.'s recorded interview statement that the

9

incident happened "about 10 times." This statement was a mere estimate by A.C. of the number of times Cipra molested her, and she later equivocated on this estimate. We are not reweighing the evidence or reassessing the credibility of witnesses to reach this conclusion. Even viewing the evidence in the light most favorable to the prosecution, the State presented insufficient evidence to convince a rational fact-finder beyond a reasonable doubt that Cipra committed 10 separate acts of rape. As we discussed, the State presented sufficient evidence to support one rape conviction. But we reverse the remaining convictions and vacate the sentences on those counts.

Affirmed in part, reversed in part, and vacated in part.

10