NOT DESIGNATED FOR PUBLICATION

No. 116,660

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

OSIE PATRICK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed September 14, 2018. Affirmed in part, vacated in part, and remanded with directions.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., HILL and BUSER, JJ.

BUSER, J.:  Following a jury trial, Osie Patrick was convicted of severity level 4 aggravated battery, criminal discharge of a firearm, criminal possession of a weapon by a convicted felon, and two counts of aggravated assault. Patrick was sentenced to 78 months' imprisonment.

On appeal, Patrick contends the district court erred by:  (1) overruling his objection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to the State's use of a peremptory challenge to strike an African-American

1

member of the jury panel; (2) failing to give a lesser included offense instruction of severity level 7 aggravated battery; (3) giving an instruction on reasonable doubt that prevented jury nullification; (4) using his criminal history to increase his sentence; and (5) classifying his 1999 conviction of driving while a habitual violator as a nonperson felony for purposes of calculating his criminal history score. Finally, Patrick claims the cumulative effect of the district court's errors denied him a fair trial.

Upon our review, we hold the district court did not err when it overruled Patrick's *Batson* challenge, denied his request for a lesser included offense instruction, and provided the jury with the standard jury instruction on reasonable doubt. As a result, there is also no cumulative error. Although we hold the district court did not commit constitutional error in considering Patrick's criminal history during sentencing, we conclude the court erroneously classified Patrick's previous conviction for driving while a habitual violator as a nonperson felony. Accordingly, the convictions are affirmed, the sentences are vacated, and the case is remanded with directions for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

On July 18, 2015, Saquisha Clark was with her friends Deirdre Dickerson, Artisha Dickerson, and Jodecie Jones. After leaving a bar, the four women were invited to a nearby establishment, the Hell's Lover's Motorcycle Club. Other than Deirdre, who was pregnant, the women had been drinking alcoholic beverages.

After staying a brief time inside the club, the women decided to leave and returned to Deirdre's car. As Deirdre began to drive away, Artisha saw her friend, Dennis Hardwell, sitting on a motorcycle in front of the club. Deirdre stopped and Clark, who was sitting in the rear passenger seat, rolled down her window so Artisha could talk to Hardwell. While Artisha was talking with Hardwell, he yelled, "Y'all ho's ain't got no home training." Clark began to argue with Hardwell and another man, Chester Randall,

2

who was nearby. During the argument, Hardwell and Randall remained seated on their motorcycles.

According to Clark, Patrick then walked up and grabbed her face through the open window in "kind of a flirty gesture." Patrick told Clark that she needed to "chill out." Clark recognized Patrick as the father of her cousin's baby, and she told Patrick to get his hands off her. The verbal altercation escalated, resulting in the two individuals exchanging punches. As they were fighting, Artisha pulled Clark away from the window to protect her. When Patrick began leaning through the window, Clark opened the car door and kicked it which caused Patrick to fall backwards.

Clark saw Patrick reach towards his pocket or waistband. Seconds later, Clark heard "a loud pow," saw a flash to the side of her face, and smelled gunpowder. As Deirdre drove away from the scene, Clark realized that she had been shot in her left leg. The bullet had entered her leg above the knee, struck an artery, and exited below the knee.

At the hospital, Clark underwent surgery to repair the damage caused by the gunshot. During the procedure, surgeons removed a vein from Clark's thigh and also placed a stent in the damaged artery. The stent will remain in the artery for the rest of Clark's life. Shortly after she was released from the hospital, Clark developed a blood clot in her left leg which required an emergency room visit. To alleviate the possibility of further blood clots, Clark is required to take blood thinning medication. Clark explained that she now has a "drop foot" in the leg where she was shot, which affects her gait.

As a consequence of the shooting, Patrick was charged with severity level 4 aggravated battery in violation of K.S.A. 2015 Supp. 21-5413(b)(1)(A), criminal discharge of a firearm, in violation of K.S.A. 2015 Supp. 21-6308(a)(1)(B), criminal possession of a weapon by a convicted felon in violation of K.S.A. 2015 Supp. 21-

3

6304(a)(3)(A), and two counts of aggravated assault in violation of K.S.A. 2015 Supp. 21-5412(b)(1). The case proceeded to a trial.

At trial, Clark testified about the shooting. She said that Patrick had thrown the first punch and a few others before she hit back once or twice. Although Clark did not see Patrick shoot her, she believed he was the shooter because he was "the guy that beat me up. He's the guy that was right there when I smelled the gunpowder and hearing the flash and all that. I mean, he's the only one." Artisha and Deirdre both testified that during the altercation, they saw Patrick pull out a gun and shoot into the car through the open window.

Detective Steven Molde testified that he interviewed Patrick after the shooting. Patrick told the detective that he was at the club on the night of the shooting, but he did not have a gun or shoot Clark. Patrick acknowledged, however, that he and Clark got into a verbal argument while Clark was in the car. Patrick told Detective Molde that Clark had first struck him on the head, and he slapped her in response. Patrick saw the car move in reverse and he jumped out of the way to avoid getting struck. As the vehicle was moving, Patrick stated that he heard a gunshot but did not know who fired the gun. Four eyewitnesses, including Hardwell and Randall, testified that Patrick did not have a gun and did not shoot Clark.

The jury convicted Patrick of severity level 4 aggravated battery, criminal discharge of a firearm, criminal possession of a firearm, and two counts of aggravated assault. Based on a criminal history score of F, the district court sentenced Patrick to a controlling sentence of 78 months in prison. He filed a timely appeal.

Patrick, an African-American, first contends the district court erred by overruling his *Batson* objection to the State's peremptory challenge of E.M., a potential juror who was also African-American. Specifically, Patrick argues that during voir dire the State did not give a sufficiently race-neutral reason for its challenge and the district court failed to make a ruling on whether there was evidence of purposeful discrimination.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution 'applies to the State's privilege to strike prospective jurors through peremptory challenges.'" *State v. Dupree*, 304 Kan. 43, 57, 371 P.3d 862 (quoting *State v. Kettler*, 299 Kan. 448, 461, 325 P.3d 1075 [2014]), *cert. denied* 137 S. Ct. 310 (2016). In *Batson*, the United States Supreme Court held that the Equal Protection Clause prohibits prosecutors from exercising peremptory challenges against potential jurors solely because of the juror's race. 476 U.S. at 89.

Under *Batson*, an objection to the State's use of a peremptory challenge during jury selection is analyzed in three distinct steps, with different standards of review for each step. *Dupree*, 304 Kan. at 57.

> "'First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step.
>
> "'Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion.
>
> "'Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. "[U]sually there is limited evidence on the issue, and the best evidence is

often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard." [Citations omitted.]'" *Dupree*, 304 Kan. at 57-58.

In this case, the parties acknowledge there was a prima facie showing that the State exercised a peremptory challenge on the basis of race. The parties focus their arguments on whether the district court (1) erred by finding the State articulated race-neutral reasons for striking an African-American potential juror; and (2) abused its discretion in concluding that Patrick did not establish purposeful discrimination.

*The Peremptory Challenge of E.M.*

During voir dire, the prosecutor asked whether any of the potential jurors or their family had been a victim of a violent act. E.M. responded that her uncle was murdered and explained that the person who killed her uncle was prosecuted. The following exchange between the prosecutor and E.M. occurred:

"[PROSECUTOR]: To the best of your knowledge, any ill will towards law enforcement or the prosecutor, State of Kansas, or anything to that effect?
"[E.M.]: Yes.
"[PROSECUTOR]: Do you believe that you can give the defense and the State a fair trial?
"[E.M.]: Yes.
"[PROSECUTOR]: And, I guess, I want to make sure I understood you. You personally hold ill will towards law enforcement or the prosecution because of that incident?
"[E.M.]: Oh, no.
"[PROSECUTOR]: I thought you said yes a minute ago, and so I just wanted to make sure.
"[E.M.]: No."

6

Later in voir dire, the prosecutor questioned E.M. about her jury information card which indicated that she had transportation issues. When asked if transportation would be a concern for her, E.M. responded, "No. I was—I mean, I would have to leave by 4:40." The prosecutor then asked E.M. if there would be times when she would have no control over what time she could arrive at court, to which E.M. replied, "No."

Prior to excusing the potential jurors after the first day of voir dire, the district court asked the parties whether they wanted to resume the trial at 9 a.m. in the morning. After defense counsel reminded the district court that E.M. had transportation issues, the court asked E.M. if she could appear in court at that time. E.M. agreed, but asked if she could leave at 4:30 p.m. during the trial's remaining days in order to ride the bus. At the conclusion of voir dire, the State peremptorily challenged E.M.

Defense counsel objected to the challenge citing *Batson*, and noting it was the second African-American struck and because there were "four African-Americans on the panel of 28, . . . this would be eliminating half of them so far by strikes." Defense counsel continued, "I think there was some confusion, but she said she didn't have a problem with the police or anything about that. So we are challenging this."

In response, the prosecutor provided his reasons for striking E.M. and the other non-white potential jurors. Regarding E.M., the prosecutor explained "there was some confusion . . . at first, she said there was ill will, and then she said there wasn't ill will towards law enforcement. I'm not quite sure where the answer actually falls." The prosecutor continued:

"[B]ut, more importantly, Judge, what's concerning to the State is her transportation. . . . [S]he asked us for special accommodations to break early for the day, I mean, at 4:50 every day. That causes the State concerns, as well. If we have a witness on past 4:50 is

7

she going to hold a grudge towards the State? Is she going to hold a grudge towards the defense?"

Defense counsel responded that E.M. arrived at court on time every day and asserted the State was challenging her because she could not afford a car. Defense counsel also noted that E.M. clarified that she had no ill will towards law enforcement. As a result, defense counsel argued the prosecutor's reasons were not valid, race-neutral reasons to strike E.M.

The prosecutor emphasized that he had "issues later in the week" which required that he conclude the trial in a timely manner. He argued that his reasons were race-neutral and invited defense counsel to show any pattern of racial bias. The prosecutor also reminded the district court that "[E.M.'s] card specifically said I may be late at times, and then she specifically asked . . . if we could make adjustments or accommodations for her. So I think it was an issue." The prosecutor further explained, "I told both Court and counsel at the very beginning of this week that my wife is leaving town and I have the responsibility [for] my kids. I am trying to get this trial done before she leaves town, because I have to be there to pick them up. So I do believe that I have expressed race-neutral reasons."

In ruling on the issue, the district court cited the applicable three-step test used in analyzing *Batson* challenges. In explaining the three-part test, the district court explicitly noted that after the State offers a race-neutral reason, the district court would determine whether purposeful discrimination had been shown by the available evidence. The district court also elaborated on certain indicators of purposeful discrimination as set forth in caselaw.

After noting the parties' concession to a prima facie showing, the district court considered the second step in the *Batson* analysis and determined the State had provided race-neutral reasons for the peremptory strike. The district judge explained:

"I couldn't tell the nature or the confusion. In fact, I've—when she answered that first way she seemed very emphatic, and I wrote it down as such. I have it in my notes under her name that she answered that way. She had ill will against law enforcement. I think even the prosecution was included in that, and then I did identify when she changed her answer on further questions."

Turning to the State's second reason for striking E.M.—her transportation issues—the district court commented that E.M. had indeed "indicated she could be late in the morning and it would be a hardship for her to stay to the normal end of the day because she needed to be home earlier than that."

After concluding that the State provided race-neutral reasons for the strike, the district judge considered whether the reasons were a pretext for impermissible racial discrimination. The district court commented that the prosecutor had struck another potential juror who was not African-American for the same reasons as E.M. The district judge ruled that Patrick failed to show purposeful discrimination, stating, "And so I'm finding the State is neutral, has been consistent in looking at and observing during this session. I don't see any of the required purposeful discrimination that I believe is required."

*Ruling Regarding the State's Race-Neutral Reasons for Striking E.M.*

Patrick alleges the States' two reasons for striking E.M. reveal a discriminatory intent. Specifically, Patrick claims that because the State's reasons are not supported by the record, they are not facially valid, and reveal an inherent discriminatory intent.

9

Under the second step of the *Batson* test, the burden shifts to the State to articulate a race-neutral reason for striking the prospective juror. In this regard, "[t]he State carries a relatively low burden to provide a race-neutral reason for a strike—the justification must be facially valid, but it need not necessarily be plausible or persuasive." *Dupree*, 304 Kan. at 59.

Patrick first argues that E.M.'s conflicting answers about her ill will towards law enforcement were resolved by her last answer which clarified that she did not have any ill will. But conflicting answers can provide the State with a race-neutral reason to peremptorily challenge a prospective juror. See *Dupree*, 304 Kan. at 59 (finding that a potential juror's conflicting responses to whether she would convict for felony murder provided a race-neutral reason for challenge).

Next, Patrick argues that the record does not support the prosecutor's concerns about E.M.'s transportation issues. As detailed earlier, however, E.M.'s statements on her jury card and her in-court statements clearly provide a factual basis to support the prosecutor's concerns that E.M. could have difficulties arriving to court on time and leaving after 4:30 p.m.

On this thorough record, we are persuaded the prosecutor proffered plausible and persuasively valid, race-neutral reasons for peremptorily challenging E.M.

*Ruling that Patrick Did Not Show Purposeful Discrimination*

Next, Patrick argues that the district court abused its discretion by failing to clearly delineate the second and third steps in his Batson ruling. Patrick asserts that "[b]y not clearly delineating the two steps, the district court denied Mr. Patrick an opportunity to sufficient[ly] argue and put on evidence to show purposeful discrimination."

10

In the final step of the *Batson* analysis, the district court must determine whether the defendant has carried the burden of proving purposeful discrimination. We review this determination for abuse of discretion. *Kettler*, 299 Kan. at 462. "A district court abuses its discretion when it makes a decision that is based on an error of law or fact; or when it makes a decision that is otherwise arbitrary, fanciful, or unreasonable." *Dupree*, 304 Kan. at 58.

Our Supreme Court has held:

"There is no formalistic requirement that the steps in the *Batson* analysis be labeled and explicitly delineated, as long as it is clear from the record that each step was in fact considered.

"As long as a trial judge affords the parties a reasonable opportunity to make their respective records, the judge may express a *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of the *Batson* challenge." *State v. Angelo*, 287 Kan. 262, Syl. ¶¶ 11-12, 197 P.3d 337 (2008).

Although not required, in this case the district court explained the three-step *Batson* test, encouraged extensive argument by the parties, and ultimately stated its reasons for ruling on each step. For example, in addressing the second step, the district court found "the State has given racially-neutral reasons for this preemptory strike." Next, after explaining why it found the State's reasons were race-neutral, the court turned to the third step and noted it was analyzing whether the State's reasons were a "coverup for impermissible racial discrimination." In explaining why Patrick failed to prove purposeful discrimination, the district judge noted that the State was neutral in its reasons and "I don't see any of the required purposeful discrimination that I believe is required."

Finally, the record does not support Patrick's assertion that he was not permitted to offer evidence of purposeful discrimination. Patrick's attorney was afforded every opportunity to present evidence and argument regarding this issue.

11

The district court did not err in overruling Patrick's *Batson* challenge.

LESSER INCLUDED OFFENSE INSTRUCTION

At the close of evidence, Patrick requested a lesser included offense instruction of severity level 7 aggravated battery. The district court denied the request, reasoning that Clark's injuries were "not trivial, minor, or in the nature of bruising."

Patrick was charged and convicted of severity level 4 aggravated battery under K.S.A. 2015 Supp. 21-5413(b)(1)(A), which defined the offense as "[k]nowingly causing great bodily harm to another person or disfigurement of another person." By contrast, severity level 7 aggravated battery is defined as "knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2015 Supp. 21-5413(b)(1)(B). The pertinent distinction between the two crimes in this case is whether Patrick knowingly caused *great* bodily harm or merely caused bodily harm. Patrick contends the district court erred by denying his request to instruct the jury on the lesser included offense of severity level 7 aggravated battery.

An appellate court reviews claimed failures to instruct on lesser included crimes using the following framework:

"When reviewing the failure to give a lesser included instruction, (1) first, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate

12

court must determine whether the error was harmless." *State v. Soto*, 301 Kan. 969, Syl. ¶ 9, 349 P.3d 1256 (2015).

In this case, at the instructions conference, Patrick objected to the district court's denial of his request for the lesser included offense instruction. As a result, this issue is properly preserved for appeal. See K.S.A. 2017 Supp. 22-3414(3); *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015) ("[A]n attorney must object on the record to the giving or omission of an instruction before the jury retires to consider the verdict, with counsel clearly stating the reason for the objection.").

Our Supreme Court has recognized that severity level 7 aggravated battery is a lesser included offense of severity level 4 aggravated battery. *State v. Williams*, 295 Kan. 506, 521, 286 P.3d 195 (2012). Thus, an instruction for severity level 7 aggravated battery was legally appropriate in this case.

Given that the requested instruction was legally appropriate, we next consider whether the failure to give the instruction was erroneous because it was factually appropriate. *State v. Knighten*, 51 Kan. App. 2d 417, 433-34, 347 P.3d 1200 (2015). Lesser included offense instructions must be given if "there is some evidence which would reasonably justify a conviction of some lesser included crime." K.S.A. 2017 Supp. 22-3414(3). To determine if the instruction is factually appropriate, an appellate court considers whether "'there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" *State v. Perez*, 306 Kan. 655, 667-68, 396 P.3d 78 (2017) (quoting *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 [2016]). If true, the lesser included offense instruction should be given.

Here, the relevant distinction between the charged crime and the requested lesser included crime is whether the victim suffered "bodily harm" or "great bodily harm."

13

K.S.A. 2015 Supp. 21-5413(b)(1)(A), (B). Although the distinction is not statutorily defined, our Supreme Court has defined great bodily harm as "more than slight, trivial, minor, or moderate harm, and does not include mere bruising, which is likely to be sustained by simple battery." *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241 (2006).

"Ordinarily, whether a victim has suffered great bodily harm is a question of fact for the jury to decide." *Williams*, 295 Kan. at 523. In *Williams*, the Supreme Court held that a lesser included instruction was necessary because a reasonable jury could conclude that a victim suffered mere bodily harm when she was stabbed in the head with a steak knife which required about 100 stitches in order to close the wound. 295 Kan. at 522-23. Importantly, the *Williams* court noted that the victim minimized her pain and did not require follow up medical care other than the removal of stitches. 295 Kan. at 523. In *Williams* the Supreme Court reaffirmed the "seemingly straightforward proposition" that "whether a victim has suffered great bodily harm is a question of fact for the jury to decide." 295 Kan. at 523.

On the other hand, our Supreme Court in *State v. Brice*, 276 Kan. 758, 774, 80 P.3d 1113 (2003), whose analysis the *Williams* court appeared to specifically approve, determined that a lesser included offense instruction for battery, which requires mere bodily harm, was not warranted when the victim sustained a through and through gunshot wound. In that case, the bullet entered the victim's upper right thigh and exited through his right buttock without hitting bone, major arteries, veins, or nerves, although it caused a scar, an overnight stay at the hospital, and the loss of a week and a half of work. Our Supreme Court noted that the district court "could determine that a bullet wound, even one that missed bone, major arteries, veins, and nerves, is not slight, trivial, moderate, or minor and will not support a lesser included instruction for battery." 276 Kan. at 774.

In this case, there was abundant evidence of the serious nature and extent of Clark's injuries. The bullet entered Clark's left leg above the knee and exited below the

14

knee. As the bullet passed through her leg, it struck an artery. Due to the extent of the damage to the artery, doctors were required to perform surgery, in which they removed a vein from Clark's thigh and placed a stent in the artery. At trial, Clark explained that the stent will remain in the artery for the rest of her life.

Shortly after being released from her three-day stay at the hospital, Clark experienced severe pain in her left leg caused by a blood clot. As a result, Clark received emergency medical treatment. Clark testified that she must take blood thinning medication for the rest of her life. Because of her "drop foot" on her left leg, Clark's ability to walk and run is impaired. At trial, the jury was shown pictures of the bullet wounds on Clark's leg as they appeared the day she was shot and the subsequent scarring.

Although it is generally within the jury's province to determine whether injuries constitute mere bodily harm or great bodily harm, we hold the district court did not err by declining to give the lesser included offense instruction. In short, there was no evidence suggesting the nature of the harm suffered by Clark was slight, trivial, minor, or moderate harm to support an instruction of the lesser included offense.

Finally, for the sake of completeness, assuming the district court did err in failing to give the lesser included offense instruction, we will consider harmless error. If the district court errs by failing to give a lesser included offense instruction, the error is reversible only if an appellate court determines there is a "'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016) (quoting *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 [2012]).

As discussed earlier, there was overwhelming evidence of great bodily harm. Moreover, Patrick's theory of defense at trial was not that Clark sustained mere bodily harm but that he did not shoot and injure Clark. In light of the evidence of the serious

nature and extent of Clark's injuries, and the theory of Patrick's defense at trial, there is no reasonable probability that the jury would have convicted Patrick of severity level 7 aggravated battery. Accordingly, even assuming error by the district court for failing to provide the lesser instruction, we conclude any such error was harmless.

REASONABLE DOUBT INSTRUCTION

Patrick next contends the district court erred when instructing the jury on reasonable doubt. He argues the instruction improperly discouraged the jury from exercising its power to nullify the verdict.

Patrick acknowledges that at trial he did not object to the instruction on reasonable doubt. Under these circumstances, an appellate court applies a more rigorous standard in deciding whether to set aside the jury's verdict and order a new trial. See *State v. Briseno*, 299 Kan. 877, 882, 326 P.3d 1074 (2014). In such cases, an appellate court may reverse only if the jury instruction as given was clear error. See K.S.A. 2017 Supp. 22-3414(3). In determining clear error, an appellate court first considers whether the district court erred at all, which requires reviewing the trial record to determine whether the instruction was legally and factually appropriate. *Williams*, 295 Kan. 506, Syl. ¶ 4. If the district court erred, we consider whether we are "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." 295 Kan. 506, Syl. ¶ 5.

Patrick specifically challenges the use of the word "should" in the last sentence of the following instruction:

"The test you must use in determining whether the defendant is guilty or not guilty is this:  If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find the defendant guilty." (Emphasis added.)

16

This instruction mirrors the pattern instruction on reasonable doubt, PIK Crim. 4th 51.010 (2017 Supp.). District courts are encouraged to use these pattern instructions "as those instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Allen*, 52 Kan. App. 2d 729, 734, 372 P.3d 432 (2016), *rev. denied* 306 Kan. 1320 (2017).

Our Supreme Court has established that "[j]uries possess the power to decide a case in a manner which is contrary to the applicable facts and law, *i.e.*, the power of jury nullification. However, a defendant is not entitled to have the jury instructed on the power of nullification." *State v. Naputi*, 293 Kan. 55, Syl. ¶ 4, 260 P.3d 86 (2011). While jurors in a criminal case have the power of jury nullification the proper duty of a jury is to accept the rules of law given to it, apply those rules to determine whether facts are proven, and deliver a verdict based on those considerations. *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973). For those reasons, criminal defendants are not entitled to have the jury explicitly instructed on its inherent power of nullification. *Naputi*, 293 Kan. at 66.

While a criminal defendant is not entitled to an instruction on jury nullification, the jury instructions may not forbid a jury from exercising its inherent power of nullification. *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014). In *Smith-Parker*, the district court instructed the jury that "'[i]f you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you *will* enter a verdict of guilty.'" 301 Kan. at 163. The defendant argued that the instruction should have used the word "should" instead of "will." 301 Kan. at 163. Our Supreme Court agreed and held that the words "must" and "will" "fly too close to the sun of directing a verdict for the State. A judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164.

17

Here, Patrick attempts to equate the jury instruction given in his case with the instruction struck down in *Smith-Parker*. In support of his argument, Patrick asserts that, under certain dictionary definitions, "should" is a synonym for "must." He then claims that because "should" and "must" denote the same meaning, under *Smith-Parker* "it is also error to instruct a jury that, in the absence of reasonable doubt, it 'should' find the defendant guilty."

Contrary to Patrick's argument, "should" does not equate to "must" or "will." As our court in *Allen* concluded:

> "Unlike the words 'must,' 'shall,' and 'will,' the word 'should' does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path. Accordingly, the reasonable doubt instruction contained at PIK Crim. 4th 51.010, which states that if the jury has no reasonable doubt as to the truth of each [of] the claims asserted by the State it 'should find the defendant guilty,' does not usurp the jury's inherent power of nullification." 52 Kan. App. 2d 729, Syl. ¶ 5.

See also *State v. McDuffie*, No. 113,987, 2017 WL 2617648, at *8-9 (Kan. App.) (unpublished opinion), *rev. denied* 306 Kan. 1327 (2017); *State v. Campbell*, No. 114,167, 2016 WL 3407598, at *3-4 (Kan. App. 2016) (unpublished opinion) (collecting cases), *rev. denied* 306 Kan. 1321 (2017).

*Allen* is dispositive of this issue. We find no error in the language of the instruction.

Next, Patrick attempts to avoid the adverse result in *Allen* and similar cases by asserting the alleged instructional error was compounded by the prosecutor's remarks during voir dire, which essentially suggested that the jurors "must follow the law." While the power of jury nullification exists, however, it is still "the proper function and duty of

18

a jury to accept the rules of law given to it in the instructions by the court, apply those rules in determining what facts are proven and render a verdict based thereon." *McClanahan*, 212 Kan. 208, Syl. ¶ 3. In fact, our court has previously held that similar statements by a prosecutor do not improperly prevent the jury from exercising its power of nullification. See *State v. Spalding*, No. 114,561, 2017 WL 1433513, at *6-7 (Kan. App. 2017) (unpublished opinion); *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at *2-3 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1322 (2017).

We conclude that the prosecutor's colloquy during voir dire simply explained, in a general way, the jury's duty to follow the law. When posing questions to the prospective jurors, the prosecutor did not even reference the jury instruction on reasonable doubt or the concept of jury nullification. As a result, the prosecutor's statements did not transform the appropriate jury instruction on reasonable doubt into an improper prohibition on jury nullification. We find no error.

CUMULATIVE ERROR

Patrick contends that if no single error at trial was sufficient to require reversal, the cumulative effect of the errors he has claimed on appeal nevertheless deprived him of a fair trial.

A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Similarly, it is an understatement to observe that no errors cannot be aggregated to constitute cumulative error. Given that we have considered Patrick's claimed trial errors on appeal and found no single error, let alone multiple errors  in the criminal proceedings which resulted in Patrick's convictions, the issue of cumulative error is without merit.

19

During sentencing, the district court determined that Patrick's criminal history score was F. This calculation was based, in part, on the classification of Patrick's 1999 conviction for driving while a habitual violator as a nonperson felony. At the time Patrick was convicted of driving while a habitual violator, the offense was classified as a nonperson felony. K.S.A 1998 Supp. 8-287. However, when Patrick committed the crimes in the present case, driving while a habitual violator was classified as a class A nonperson misdemeanor. K.S.A. 2015 Supp. 8-287.

For the first time on appeal, Patrick contends the district court imposed an illegal sentence when it classified his 1999 conviction for driving while a habitual offender as a nonperson felony for criminal history purposes. We may consider this issue because a defendant may challenge a sentence for the first time on appeal. *State v. Fisher*, 304 Kan. 242, 263-64, 373 P.3d 781 (2016). "Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review." 304 Kan. at 263.

In *State v. Keel*, 302 Kan. 560, 573, 357 P.3d 251 (2015), our Supreme Court determined that "[t]he provisions of the [Kansas Sentencing Guidelines Act] itself . . . instructed that prior convictions or adjudications be classified at the time of the current crime of conviction." The court explained:

> "Because it is a fundamental rule of sentencing that the penalty parameters for a crime are established at the time the crime was committed, the classification of a prior conviction or juvenile adjudication for criminal history purposes under the KSGA must be based on the classification in effect for the comparable offense when the current crime of conviction was committed." 302 Kan. 560, Syl. ¶ 9.

20

In reaching this determination, the court in *Keel* relied in part on what is now K.S.A. 2017 Supp. 21-6810(d)(8), which states:  "Prior convictions of a crime defined by a statute that has since been repealed shall be scored using the classification assigned at the time of such conviction." The court found that "[t]he clear implication is that if the statute has not been repealed, then the crime is scored using the classification in the statute at the time of the current crime of conviction." 302 Kan. at 580.

Although the prior conviction at issue in *Keel* was a pre-KSGA offense, Patrick argues the rule and reasoning in *Keel* required the district court to classify his 1999 conviction based on the classification in effect when he committed the current crimes of conviction. The State candidly concedes that, under *Keel*, the district court erred by classifying his 1999 driving while a habitual violator conviction as a nonperson felony instead of a class A nonperson misdemeanor. Both parties agree that our court should remand for resentencing.

We agree that *Keel* is dispositive. Accordingly, we vacate Patrick's sentence and remand the matter to the district court with directions to reclassify the 1999 driving while a habitual violator conviction as a class A nonperson misdemeanor, recalculate Patrick's criminal history score based on the reclassification, and resentence Patrick based on the recalculated criminal history score.

On another sentencing issue, Patrick contends the district court violated his constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution as recognized in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it used his prior convictions to increase his sentence without requiring the State prove them beyond a reasonable doubt before a jury. Patrick acknowledges that the Kansas Supreme Court rejected this argument in *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002).

Our court is duty bound to follow Kansas Supreme Court precedent absent some indication the court is departing from its earlier position. See *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014). There is no indication that our Supreme Court is departing from its holding in *Ivory*. See *State v. Williams*, 306 Kan. 175, 176, 392 P.3d 1267 (2017) (reaffirming *Ivory*). We find no error in this regard.

The convictions are affirmed, the sentences are vacated, and the case is remanded with directions for resentencing.