NOT DESIGNATED FOR PUBLICATION

No. 121,712

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FRANCISCO EDUARDO NOCHES-PADILLA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Crawford District Court; KURTIS I. LOY, judge. Opinion filed August 6, 2021. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Kurtis Wiard*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., BRUNS, J., and STEVE LEBEN, Court of Appeals Judge Retired, assigned.

POWELL, J.:  Francisco Eduardo Noches-Padilla was convicted by a jury of his peers of 15 Jessica's Law offenses and 3 other child sex offenses. The district court imposed 15 consecutive hard 25 life sentences plus 177 months in prison. Noches-Padilla now appeals claiming numerous trial errors. He also argues the district court abused its discretion by imposing so many consecutive life sentences as to make his sentence one equaling life without the opportunity of parole. After a careful review of the record, we find only one error by the district court—its admission of one translated letter written by Noches-Padilla because the translator of that letter was not available to lay a foundation

1

for the translation. But we find this error harmless as it would not have altered the outcome of the trial. As Noches-Padilla's other contentions of error lack merit, we affirm his convictions and sentences.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Noches-Padilla with 13 counts of rape of a child under the age of 14, 4 counts of aggravated indecent liberties with a child, and 1 count of criminal sodomy, for crimes occurring between January 2012 and August 2017. At trial, the victim, A.H., testified how Noches-Padilla, a man in his 30s she called her stepfather—though he was not married to her mother—sexually abused her from ages 10 to 15.

When A.H. was in the fifth grade, Noches-Padilla began touching her breasts, legs, and vagina at least twice a week. When A.H. turned 11 or 12, Noches-Padilla began forcing her to have sex with him. One night, A.H. woke up to Noches-Padilla touching her vagina, and he then inserted his penis inside her. Noches-Padilla began forcing A.H. to have sex once a week and then progressed to multiple times per week. By the time A.H. reached her sophomore year, Noches-Padilla was forcing her to have sex with him at least four times per week.

When A.H. was 13, Noches-Padilla—then age 34— took her to 13 weekly physical therapy appointments from February 2015 to April 2015 to receive treatment for a sprained ankle. Noches-Padilla would remove A.H. from school early to take her to her appointments. Before each appointment, he would take her to a lake near their home and force her to have sex with him in his car. Noches-Padilla would instruct A.H. to get in the back of the vehicle in a certain position, touch her vagina and his penis, and insert his penis inside her. He would wipe up his ejaculate with a towel and throw it out the window as they drove away. A.H. recalled that one of the vehicles Noches-Padilla drove to the lake was a Nissan Pathfinder.

2

Noches-Padilla also forced A.H. to have sex with him her freshman year when she was attending a sports award banquet at her school. Noches-Padilla instructed A.H. to come out to his car, which he parked next to the playground. Noches-Padilla made A.H. get into the back of the vehicle where he had sex with her.

On April 26, 2017—when A.H. was 15—A.H.'s mother, C.H., underwent an emergency C-section to deliver A.H.'s younger sister. While C.H. was immediately recovering from the surgery, A.H. and Noches-Padilla were directed to wait in C.H.'s hospital room. Inside the room, Noches-Padilla went to the restroom and told A.H. to join him for sex. A.H. refused because it was a public area. Noches-Padilla grabbed her, pulled down her pants, and had sex with her in the bathroom.

Sometime in August 2017, Noches-Padilla crawled through A.H.'s bedroom window when she finished showering and forced her to have sex with him. He ejaculated on the carpet but later cleaned it up with a towel. A.H. said she was afraid of Noches-Padilla because he could be really abusive. Another time, Noches-Padilla forced A.H. to perform oral sex on him.

On September 6, 2017, C.H. confronted A.H. after school about her relationship with Noches-Padilla. A.H. knew C.H. would confront her because Noches-Padilla called A.H.'s school earlier and left a message for A.H. to call him. Noches-Padilla warned A.H. to deny everything.

At trial, A.H. testified she never said anything before because she was so afraid of Noches-Padilla. Noches-Padilla threatened to come and find A.H. no matter how long his prison sentence was.

The State admitted and published at trial—over defense counsel's objections—two videos of forensic interviews of A.H. conducted by the Kansas Department for Children

3

and Families shortly after the sexual abuse was reported. During the interviews, A.H. recounted the details of the abuse.

Officer William Combs of the Crawford County Sheriff's Department also testified at trial. On September 6, 2017, he was dispatched to A.H.'s home. His body camera recorded the visit, and the footage was admitted into evidence. A.H. broadly describes the sexual abuse in the video. Combs talked with Noches-Padilla when he arrived at the house. Combs testified that Noches-Padilla denied all abuse allegations but often laughed or smiled when confronted with specific questions of sexual intercourse with A.H. Noches-Padilla told Combs that C.H. had suspected him of cheating on her, and she had confronted him about it that day.

Combs obtained A.H.'s physical therapy records, documenting 13 appointments from February to April 2015. The physical therapist who treated A.H. testified that he remembered Noches-Padilla bringing A.H. to each appointment.

During his investigation, Combs collected several letters Noches-Padilla wrote his family from jail. All but one of the letters were translated by Angela Pallares, who testified about her translations at trial. The letters were admitted into evidence.

In his letters, Noches-Padilla discussed his situation with his family members. He told his brother he fell into temptation and "I know it is my fault but she does not understand that it is the fault of two. We fell for this great sin, my eyes for the flesh. The other was hers for being ambitious." Noches-Padilla also wrote to C.H. to tell her not to worry about what other people would say to her or A.H. if they dropped the charges. Noches-Padilla pleaded with his family to go to his lawyer and withdraw everything.

One other letter Noches-Padilla wrote—addressed to his daughter, D.N., telling her to tell A.H. that what happened was A.H.'s fault because of her ambition and love for

4

money—was also admitted at trial. Vanessa DeLuna translated this letter but did not testify at trial.

Based on A.H.'s accounts of the sexual assaults, Combs removed pieces of carpet from A.H.'s bedroom and three pieces of seat fabric from the Pathfinder to look for evidence of Noches-Padilla's semen. Combs admitted the samples he took were essentially a guess to where he might find evidence. A forensic scientist testified that she could not detect any seminal fluid on the samples.

Sarah Gill, a sexual assault nurse examiner (SANE), performed a sexual assault examination on A.H. in September 2017. In her opinion, the exam revealed a healed interruption in A.H.'s hymen. Wendy Overstreet, another SANE, performed a second examination and found no evidence of healed trauma.

Noches-Padilla testified and denied all the allegations. He admitted to writing the letters admitted into evidence.

The jury found Noches-Padilla guilty of each charge.

At sentencing, the district court sentenced Noches-Padilla on each rape count, the aggravated criminal sodomy count, and one aggravated indecent liberties with a child count to life in prison without the possibility of parole for 25 years as well as 59 months in prison for each of the three remaining counts of aggravated indecent liberties with a child. The district court ordered all sentences to run consecutive.

Noches-Padilla now appeals.

I.  DID THE DISTRICT COURT ERR WHEN IT ALLOWED C.H. TO INVOKE HER PRIVILEGE AGAINST SELF-INCRIMINATION?

For his first issue, Noches-Padilla argues the district court erred when it allowed C.H. to avoid cross-examination by invoking her privilege against self-incrimination under the Fifth Amendment to the United States Constitution. Noches-Padilla claims the district court erred by informing C.H. of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which are not applicable at trial. Noches-Padilla argues C.H. was not entitled to invoke this right because the questions were about her immigration status, not about any crimes she may have committed. Alternatively, Noches-Padilla argues C.H. waived any Fifth Amendment rights she may have had by answering questions posed by the State.

The State responds that Noches-Padilla invited any error by informing the district court he was going to ask C.H. about committing a crime and recommending the district court should inform C.H. of her privilege against self-incrimination. The State also asserts the district court correctly advised C.H. about her privilege against self-incrimination and she properly invoked it.

*Standard of Review*

Whether a person can lawfully claim a Fifth Amendment privilege against self-incrimination is a legal question reviewed de novo. *State v. George*, 311 Kan. 693, 706, 466 P.3d 469 (2020).

*Analysis*

Noches-Padilla admits he did not object to the district court's rulings on whether C.H. could invoke her Fifth Amendment privilege but asserts we can hear this issue under

6

two exceptions to the requirement that issues must first be raised below: "(1) the newly asserted theory involves 'only a question of law arising on proved or admitted facts and the issue is finally determinative of the case'; (2) 'the resolution of the question is necessary to serve the ends of justice or to prevent denial of fundamental rights.'" *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). We choose to sidestep the preservation issues because even if we assume the issue is properly before us, we are unpersuaded by Noches-Padilla's arguments on the merits.

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "A witness who is compelled to testify . . . has no occasion to invoke the privilege against self-incrimination until testimony sought to be elicited will in fact tend to incriminate. . . . [The witness] must be able to raise a bar" to his or her testimony at the point when the right becomes operative. *Brown v. United States*, 356 U.S. 148, 155, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958).

The right to confront witnesses is a fundamental right and includes the cross-examination of witnesses; at the same time, a witness has the privilege against self-incrimination, a right that is also an element of due process. When both rights are asserted, as in this case, we do not resolve the problem by weighing each right. "Generally . . . a trial court is required to protect an accused's right of confrontation short of compelling the witness against him to abdicate his privilege of self-incrimination. Where the assertion of the privilege against self-incrimination prevents effective confrontation . . . the situation is remedied by striking the testimony of the witness. [Citation omitted.]" *State v. Montanez*, 215 Kan. 67, 69-70, 523 P.2d 410 (1974).

After C.H. invoked her privilege against self-incrimination, the district court decided to strike her testimony because she was no longer available as a witness, and it instructed the jury to disregard any testimony it heard from C.H. The State disagreed with

the limiting instruction but did not object to it. Noches-Padilla agreed with the instruction but moved for a mistrial, which the district court denied.

Noches-Padilla does not challenge the district court striking of C.H.'s testimony; rather, he challenges the district court allowing C.H. to invoke her privilege against self-incrimination, arguing: (1) C.H. could not claim the right because she was being asked about immigration matters; (2) C.H. waived the right when she admitted to using another's papers to work; and (3) the district court's use of the *Miranda* warnings was inappropriate to inform C.H. of her rights.

First, Noches-Padilla argues C.H.'s privilege against self-incrimination was not triggered because defense counsel was questioning her about her immigration status—a civil, not criminal, matter. Noches-Padilla is correct that immigration status, including deportation/removal, is a civil matter. See *Arizona v. United States*, 567 U.S. 387, 396, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). Though immigration status is not a sufficient ground to invoke the right, if a witness can show that any testimony could be used in a criminal proceeding against him or her by the United States or one of the States, a witness may invoke the privilege against self-incrimination. *United States v. Balsys*, 524 U.S. 666, 671-72, 118 S. Ct. 2218, 141 L. Ed. 2d 575 (1998). Both Noches-Padilla and the State list several different criminal statutes that C.H.'s testimony could have triggered. Rather than go in-depth to determine whether those elements of both federal and state crimes could have been met, it is simplest to just rely on defense counsel's statements. At the bench conference, defense counsel told the district court he was going to ask C.H. if she "committed a crime of moral turpitude." Defense counsel's intent to ask C.H. if she committed a crime triggered her privilege against self-incrimination because he intended to ask her about acts which could constitute a crime. Also, there is no evidence in the record that she had ever been prosecuted for a crime of moral turpitude, leading to the risk that her statements could be used against her in a future criminal action.

8

Second, Noches-Padilla claims C.H. waived her right against self-incrimination. Noches-Padilla asserts "the horse was already out of the barn" because C.H. admitted to using someone else's documents to obtain work when the State objected. C.H.'s statement that she "worked with those papers" is a generic statement that does not by itself lead one to conclude she committed a distinct crime. Before defense counsel could further explore that statement, the State objected. At the bench conference, defense counsel informed the district court he intended to ask her if she committed a crime of moral turpitude, suggesting defense counsel had a specific crime he wanted to ask C.H. about. Thus, C.H. did not waive her privilege against self-incrimination because her generic statements were not sufficient to show she committed a crime.

Third, Noches-Padilla argues the district court erred by allowing C.H. to invoke her *Miranda* right to remain silent when *Miranda* does not apply to trial witnesses. Once the district court informed C.H. of her privilege against self-incrimination, the district court read C.H. her *Miranda* rights. Neither party objected to this course of action. Noches-Padilla argues *Miranda* is both too narrow and too broad at the same time to be appropriate for a trial witness.

There is no established method to inform a nondefendant witness of his or her privilege against self-incrimination. While a *Miranda* warning is typically used in a custodial interrogation, it does inform the recipient that he or she has the right to remain silent. We see nothing wrong with the district court's use of the *Miranda* warnings as they did inform C.H. that cross-examination could lead her to incriminate herself and she had the right to remain silent. C.H. properly invoked her right to remain silent by informing the district court she did not want to answer any more questions without an attorney present. The district court did not err in allowing C.H. to invoke her privilege against self-incrimination.

9

*Harmless Error*

However, even if we assume the district court erred by giving C.H. *Miranda* warnings, any such error was harmless. The window through which we view harmless error is determined by whether the error implicated a constitutional right. If a constitutional right is implicated, we "must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). If not, then we "must be persuaded that there is no reasonable probability that the error [affected] the outcome of the trial." 292 Kan. at 565. The party benefitting from the error has the burden to show the error was harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Noches-Padilla asserts the constitutional harmless error test applies because his fundamental right to present his defense was violated. The State argues it can meet this higher standard. Thus, we shall apply the constitutional harmless error standard.

Several factors considered when

"reviewing the erroneous exclusion of evidence for harmless error include: 'the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the case.' [Citation omitted.]" *State v. Burnett*, 300 Kan. 419, 434-35, 329 P.3d 1169 (2014).

First, C.H.'s testimony added little evidence of substance to the trial. C.H. did not provide any testimony about the actual events that supported the charges against Noches-Padilla. C.H.'s testimony explained the context in which A.H. reported the abuse. Noches-Padilla claims C.H.'s testimony about her crime of moral turpitude—ineligibility

to obtain citizenship—and her subsequent ability to become an American citizen shows C.H.'s bias and motivations to fabricate these allegations against Noches-Padilla. However, A.H. was the victim, not C.H., and A.H. was the one who testified about what Noches-Padilla did to her. C.H. provided little testimony to prove Noches-Padilla committed the charged crimes. Noches-Padilla claims the questions were necessary to impeach A.H.'s credibility in a case in which credibility was paramount, but he does not explain how C.H.'s alleged bias or motivations impeach A.H.'s credibility. Noches-Padilla does not offer any evidence how C.H.'s actions would prove A.H. fabricated the allegations.

Second, much of C.H.'s testimony was cumulative. Combs testified that C.H. suspected Noches-Padilla was having an affair. A.H. discussed this in her forensic interview too. Much of what C.H. testified to about her suspicions and the circumstances surrounding A.H. reporting the sexual abuse to law enforcement were also testified to by A.H., Combs, and D.N.

Third, other witnesses corroborated C.H.'s testimony. Noches-Padilla argues A.H.'s testimony that family members confronted her about disclosing the accusations to law enforcement coupled with a motive to fabricate charges would have corroborated an attack on A.H.'s credibility. Again, Noches-Padilla provides no evidence A.H. had any motivation to fabricate the allegations. His allegations focus entirely on C.H., who was neither the victim nor provided any testimony on the allegations.

Fourth, Noches-Padilla was not allowed to fully cross-examine C.H. about her direct testimony, which was largely due to the strategy of his defense counsel. Defense counsel decided to question C.H. about an alleged crime early in his cross-examination. Defense counsel could have asked C.H. those questions at any time but chose to do so early in the examination. Further, Noches-Padilla's inability to fully cross-examine C.H.

was mitigated by the district court's instruction to the jury to disregard C.H.'s entire testimony once she invoked her privilege against self-incrimination.

Fifth, the overall strength of the case against Noches-Padilla was strong. A.H. described Noches-Padilla's repeated sexual abuse in great detail. In contrast, Noches-Padilla testified none of it happened. Moreover, Noches-Padilla's letters were admitted into evidence where he confessed: "I know it is my fault." He also told his family he would be indebted to them if they would have the charges dropped. Thus, if any error occurred, it was harmless.

II.     DID THE DISTRICT COURT ABUSE ITS DISCRETION WHEN IT ADMITTED STATE'S EXHIBIT 4?

For his second issue, Noches-Padilla asserts the district court erroneously admitted State's Exhibit 4—the letter to his daughter, D.N., translated by DeLuna—into evidence without requiring DeLuna to testify as to her qualifications as a translator. Noches-Padilla argues this error was not harmless because that letter was the only one to explicitly mention A.H. by name.

The State offers several counterarguments. First, the State asserts Noches-Padilla did not preserve the issue for appeal because he only objected to the letter's chain of custody at its admission, not the foundation for DeLuna's translation. Second, the State argues Kansas Supreme Court precedent requiring a translator to testify about his or her qualifications was an incorrect reading of the statute and should be disregarded. Finally, the State argues any error was harmless.

*Standard of Review*

A district court's evidentiary rulings on foundation evidence are reviewed for abuse of discretion. See *State v. Banks*, 306 Kan. 854, 865-66, 397 P.3d 1195 (2017). A district court abuses its discretion if its action is one no reasonable person would have adopted, is based on an error of law, or is based on an error of fact. The party asserting the abuse of discretion occurred bears the burden of establishing the abuse. *State v. Darrah*, 309 Kan. 1222, 1227, 442 P.3d 1049 (2019).

*Preservation*

The State argues Noches-Padilla did not preserve this issue and seeks to distinguish Noches-Padilla's objections to the D.N. letter. When the State sought to admit Exhibit 4 during Combs' testimony, Noches-Padilla objected to the foundation of the letter because the State had not established the chain-of-custody and soundness of the translation because DeLuna was not subpoenaed to testify. In response to the objection, the parties agreed the letter would not be admitted at that time, but the district court ruled the letter would be accepted as to the chain-of-custody. Later, the State moved again to admit Exhibit 4 during D.N.'s testimony. Defense counsel again objected to "foundation for chain of custody." After the district court admitted the letter, defense counsel objected to the State publishing the letter by having D.N. read it aloud. The district court eventually allowed the State to publish the letter and have D.N. read it in English.

The State argues Noches-Padilla's objections at the time Exhibit 4 was admitted show he was no longer objecting to the translation and his argument here should be considered abandoned.

A challenge to the admission of evidence is not preserved unless there is a timely objection on the record stating a specific ground for the objection. K.S.A. 60-404.

13

Noches-Padilla objected to the chain of custody of Exhibit 4 and to DeLuna's translation being admitted without her testifying to her qualifications. When the State tried to admit the letter a second time, Noches-Padilla's objection appeared to combine the two issues. While the exact nature of this objection is not clear, his objections at the State's previous attempt to admit the letter and the issue he took with the translation when the letter was admitted were sufficient for the district court to understand Noches-Padilla objected to the admission of DeLuna's translation without her testimony. See *State v. Randle*, 311 Kan. 468, 480, 462 P.3d 624 (2020) (finding objection preserved when defense counsel misspoke about specific grounds of objection, but district court knew issue of video and had opportunity to rule on it).

Additionally, when Noches-Padilla objected to Exhibit 4 the first time, the district court ruled Noches-Padilla could subpoena DeLuna if he wished to challenge her qualifications. That ruling likely led Noches-Padilla's counsel to believe the issue of the translation's foundation had been decided. Defense counsel's actions fulfilled the purposes of the contemporaneous objection rule under K.S.A. 60-404 and preserved the issue for appellate review. See *Randle*, 311 Kan. at 480.

*Analysis*

DeLuna did not testify at trial. Instead, her translation of Exhibit 4 was admitted with an affidavit asserting her qualifications as a translator of Spanish.

Kansas Supreme Court precedent holds a translator cannot establish his or her own qualifications as a translator by affidavit. By making a translation, the translator acts in the capacity of an expert, and the translator's competency "should be open to inquiry by the party against whom the translated documents are to be used as evidence." *Missouri, Kansas & Texas Railway Co. v. Bagley*, 60 Kan. 424, 435, 56 P. 759 (1899). "The statute governing the admissibility of such evidence . . . contemplates that a witness acting as a

translator should not prove his competency by his own *ex parte* affidavit, but that he should be brought before the court and examined as a witness, or his deposition taken, [thereby] affording . . . the opportunity of cross-examination." 60 Kan. at 435; see *State v. Van Pham*, 234 Kan. 649, 660, 675 P.2d 848 (1984) (holding K.S.A. 60-418, K.S.A. 60-419, and K.S.A. 75-4354 require translator to present evidence in form of testimony, not ex parte affidavit). The State acknowledges *Bagley*'s holding but argues it was an incorrect reading of the statute. The State asserts that given the Kansas Supreme Court's emphasis on the plain language of the statute, *Bagley* would not pass muster today.

Whether the Supreme Court would agree with *Bagley* were it to address the issue today is not for us to decide. While the Supreme Court has emphasized the importance of a statute's plain language, see *State v. Smith*, 309 Kan. 929, 936, 441 P.3d 472 (2019), it has given no indication *Bagley* is no longer good law. If *Bagley*'s holding needs refined, modified, or overturned, it is the Supreme Court's province to effect that change. Until that happens, we are duty-bound to follow it. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). The district court's admission of Exhibit 4 without DeLuna's testimony was in error.

*Harmless Error*

In arguing against harmless error, Noches-Padilla raises the standard harmless error analysis, but he does not argue it violated his constitutional rights. Under the nonconstitutional harmless error analysis, we must be convinced "there is no reasonable probability that the error will or did affect the outcome of the trial." *Ward*, 292 Kan. at 565; see K.S.A. 2020 Supp. 60-261. The State, as the party benefitting from the error, has the burden to prove the error was harmless. See *McCullough*, 293 Kan. at 982-83. A court must disregard any errors that do not affect a party's substantial rights. K.S.A. 2020 Supp. 60-261.

Although the district court erred in admitting Exhibit 4, the error was harmless. A.H. testified extensively at trial about the times Noches-Padilla sexually abused her. Additionally, the body camera video and her forensic interview provided a consistent recounting of the events from the time law enforcement became involved to the trial.

During his testimony, Noches-Padilla simply claimed none of the events happened but did not offer any evidence to counter A.H.'s testimony. Noches-Padilla also admitted to writing the letters the State admitted, although he denied they were an admission of his guilt. It is clear from the context and timing of his letters that Noches-Padilla was referring to having sex with A.H. Exhibit 4 was the only one to mention A.H. by name, but even without Exhibit 4, the other letters provided additional evidence of his guilt.

While the district court erred in admitting Exhibit 4, the error was harmless because there is no reasonable probability the error affected the outcome of the trial.

III. DID THE DISTRICT COURT ERR IN ADMITTING A.H.'S FORENSIC INTERVIEWS BECAUSE THEY WERE CUMULATIVE?

Noches-Padilla also argues the forensic interviews were cumulative because they, along with other evidence, conditioned the jury to believe A.H.'s testimony by the time she took the witness stand. The State points out cumulative evidence is determined by its kind and nature, not its effect, and argues the forensic interviews were not cumulative because A.H. divulged more information in the interviews about the events than what was in her testimony.

*Standard of Review*

Whether a district court erred in admitting cumulative evidence is reviewed for abuse of discretion. *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 (2016). A district

16

court abuses its discretion if its action is one no reasonable person would have adopted, is based on an error of law, or is based on an error of fact. The party asserting the abuse of discretion occurred bears the burden of establishing the abuse. *Darrah*, 309 Kan. at 1227.

*Analysis*

"'Cumulative evidence is evidence of the same kind to the same point.'" *Dupree*, 304 Kan. at 65. Cumulative evidence by itself is not objectionable, and error cannot hinge on allowing the use of such evidence. A claim that evidence is cumulative does not challenge relevance but asserts that the evidence is repetitive of other evidence already admitted and unnecessary to the point of becoming unduly prejudicial. See *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996). The discretion to admit or exclude cumulative evidence is traditionally left to the sound judgment of the trial court. *State v. Meggerson*, 312 Kan. 238, 257, 474 P.3d 761 (2020); see also K.S.A. 2020 Supp. 60-445 (stating district judge may in his or her discretion exclude evidence whose probative value is substantially outweighed by its prejudicial effect). But evidence is not cumulative when it provides additional evidence or a different view of the evidence. *Dupree*, 304 Kan. at 65 (holding multiple photographs of victim's body not cumulative because photos showed different angles and distances to provide more complete image to jury).

Noches-Padilla argues that admitting repetitive testimony allowed the State to use the "illusory truth effect" against him by having A.H.'s allegations repeatedly presented to the jury to condition the jurors to believe A.H. before she testified. There are two problems with this argument. First, as another panel of our court noted, evidence of prior consistent statements of a witness who testifies is characteristic in the prosecution of child sex crimes. *State v. Kackley*, 32 Kan. App. 2d 927, 934-35, 92 P.3d 1128 (2004). Moreover, the panel adopted an exception to the general rule that prior consistent statements of a witness are inadmissible, holding that such evidence is admissible for the

17

purpose of corroborating the witness' testimony in prosecutions for sexual abuse of children. 32 Kan. App. 2d at 934-35. Thus, even if these prior consistent statements had an "illusory truth effect," it was not error for the district court to have admitted them.

Second, Noches-Padilla's argument runs into another insurmountable wall—whether evidence is cumulative is determined by its kind and character, not its effect. *Dupree*, 304 Kan. at 65. Therefore, any "illusory truth effect" Noches-Padilla asserts occurred is not relevant to the cumulative evidence analysis.

Noches-Padilla relies on *In re Habeas Corpus Petition by Bowman*, 309 Kan. 941, 441 P.3d 451 (2019), to support his claim that the Kansas Supreme Court disapproves of putting on corroborating hearsay evidence before the witness testifies. But Noches-Padilla misinterprets *Bowman*, and the case is distinguishable from his appeal.

In *Bowman*, the district court granted a mistrial after the child-victim refused to take the oath and testify at trial. The State had previously introduced a phone call to the police and out-of-court statements made by the child to her mother and grandmother. The Kansas Supreme Court explained the district court could have cured this issue by instructing the jury to disregard the hearsay statements already admitted instead of declaring a mistrial and the district court had the power to "neutralize the ill effects to either party from the collapse of the prosecutor's trial strategy." 309 Kan. at 952-53. The Kansas Supreme Court held the mistrial statute—K.S.A. 22-3423—did not support the district court's decision. 309 Kan. at 953.

Noches-Padilla is correct that the Supreme Court said it is a better practice to have the hearsay declarant take the stand before the out-of-court statements are admitted. But the *Bowman* court was suggesting a better practice for the State—recognizing the risk of the evidence having to be disregarded if the hearsay declarant did not take the stand. The Supreme Court also recognized the State assumes this risk when the prosecutor admits

18

out-of-court statements into evidence before the hearsay declarant testifies but also noted that not doing so does not violate the Confrontation Clause when the declarant does testify. 309 Kan. at 954.

The State argues the evidence was not cumulative because the forensic interviews contained more information than A.H.'s testimony. We agree. In her interview, A.H. discussed other instances of sex with Noches-Padilla, that the sex hurt her, that sometimes Noches-Padilla wore a condom but other times he did not, and that he would make her take pregnancy tests, among other things.

Noches-Padilla does not explain how the district court abused its discretion. The forensic interviews occurred closer to the alleged crimes and provided a more contemporary account of the events. And defense counsel had a chance to cross-examine A.H. about the statements she made during the interview and any inconsistencies between her forensic interviews and her testimony. The district court did not commit a legal or factual error, and a reasonable person could agree with the district court's decision to admit A.H.'s forensic interviews.

IV.    DID THE DISTRICT COURT ERR WHEN IT PLACED "GUILTY" BEFORE "NOT GUILTY" ON THE VERDICT FORM?

Noches-Padilla next argues placing "guilty" on the verdict form before "not guilty" undercuts his constitutional right to the presumption of innocence. Noches-Padilla acknowledges the issue was decided against him in *State v. Wesson*, 247 Kan. 639, 802 P.2d 574 (1990), but argues *Wesson* was a misstatement of law because the jury should focus on a defendant's innocence, not guilt.

*Standard of Review*

A verdict form is not technically an instruction, but, as it is part of the packet sent with the jury which includes the instructions and helps the jury reach a verdict, it is appropriate to apply the same standard of review to challenges to the verdict form as it is to jury instruction appeals. *Unruh v. Purina Mills, LLC*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009).

> "'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

The first and last steps are interrelated because whether a party preserved the issue affects the reversibility inquiry. *State v. Bolze-Sann*, 302 Kan. 198, 209, 353 P.3d 511 (2015). If the district court erred in denying a proposed instruction and the error does not violate a constitutional right, the error will only be reversed if there is a reasonable probability the error affected the outcome of the trial in light of the entire record. *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016).

*Analysis*

The *Wesson* court held a jury is instructed on the defendant's presumption of innocence and the purpose of the trial is to determine whether the defendant is guilty. Because of that purpose, there is no prejudice to a defendant by having "guilty" placed before "not guilty" on the verdict form. 247 Kan. at 652. The Supreme Court reaffirmed its holding in *State v. Wilkerson*, 278 Kan. 147, 158-59, 91 P.3d 1181 (2004).

Noches-Padilla acknowledges *Wesson* and *Wilkerson* but argues they misstated the law. Noches-Padilla claims a jury must focus on a defendant's innocence and *Wesson* was incorrect to state the purpose of a trial is to determine whether a defendant is guilty.

We are unpersuaded by Noches-Padilla's argument. While a defendant is indeed innocent until proven guilty, the entire purpose of the jury's presence in our judicial system is to determine if the State met its burden to prove guilt. In fact, a jury never determines innocence, only whether a defendant is guilty or not guilty.

The merits aside, our hands are tied by our duty to follow Supreme Court precedent. See *Rodriguez*, 305 Kan. at 1144. The Kansas Supreme Court has shown no indication that it is changing course on this issue. Instead, it has recently reaffirmed its support of *Wesson*'s holding in a case in which the defendant made a similar argument to Noches-Padilla. See *State v. Fraire*, 312 Kan. 786, 796, 481 P.3d 129 (2021); see also *State v. Williams*, 58 Kan. App. 2d 409, 416, 471 P.3d 17 (2020) (acknowledging 30-year history of consistent application of *Wesson*).

21

V.      DOES CUMULATIVE ERROR REQUIRE REVERSAL OF NOCHES-PADILLA'S CONVICTIONS?

For his final allegation of trial error, Noches-Padilla argues the multiple errors he alleges occurred at trial denied him the right to a fair trial and their weight requires reversal.

*Standard of Review*

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction." *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). We review de novo "whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error." *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014).

*Analysis*

To determine whether cumulative errors were harmless, "an appellate court examines the errors in the context of the record as a whole considering how the trial judge dealt with the errors as the arose . . . ; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). "'One error cannot support reversal under the cumulative error doctrine.'" *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020).

Here, the only error that occurred was the admission of State's Exhibit 4. That single error cannot establish cumulative error.

## VI. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN IMPOSING CONSECUTIVE SENTENCES ON NOCHES-PADILLA'S 18 CONVICTIONS?

Finally, Noches-Padilla asserts the district court abused its discretion by ordering the sentences for each count to run consecutive. Given that the district court imposed 15 hard 25 life sentences and three 59-month sentences, Noches-Padilla argues his sentences guarantee he cannot be paroled for at least 385 years and are effectively a life sentence without parole. Noches-Padilla argues it is unreasonable for a district court to impose a sentence that is impossible for a defendant to serve. The State counters the district court entered an appropriate sentence under the facts.

*Standard of Review*

A sentencing judge has "discretion to impose concurrent or consecutive sentences in multiple conviction cases." K.S.A. 2020 Supp. 21-6819(b). A sentencing court abuses its discretion if its action is one no reasonable person would have adopted or is based on an error of law or fact. The party asserting the abuse of discretion occurred bears the burden of establishing the abuse. *Darrah*, 309 Kan. at 1227.

By claiming the district court effectively imposed a life sentence without parole that was not proportionate to the harm and culpability associated with his crimes, Noches-Padilla essentially argues no reasonable person would have adopted the court's view. See *State v. Shank*, 304 Kan. 89, 92-93, 369 P.3d 322 (2016).

*Analysis*

K.S.A. 2020 Supp. 21-6819(b) grants the sentencing court discretion to impose concurrent or consecutive sentences in a multiple conviction case and instructs that sentencing courts "may consider the need to impose an overall sentence that is

23

proportionate to the harm and culpability and shall state on the record if the sentence is to be served concurrently or consecutively." There is no statutory list of specific factors for the sentencing court to consider in making its decision. *Darrah*, 309 Kan. at 1227. It is the duty of the sentencing judge alone to determine the appropriate sentence to be imposed "by exercising his or her best judgment, common sense, and judicial discretion after considering all of the reports, the defendant's background, the facts of the case, and public safety." *State v. Vanderveen*, 259 Kan. 836, 842, 915 P.2d 57 (1996).

Noches-Padilla was convicted of 1 count of aggravated indecent liberties with a child, see K.S.A. 2020 Supp. 21-5506(b)(3)(A); 13 counts of rape, see K.S.A. 2020 Supp. 21-5503(a)(3); 1 count of aggravated criminal sodomy, see K.S.A. 2020 Supp. 21-5504(b)(1); and 3 counts of aggravated indecent liberties with a child, see K.S.A. 2020 Supp. 21-5506(b)(1). In making its decision to run the 18 sentences consecutive, the district court explained:

> "[K.S.A.] 21-6819 gives this Court the discretion to impose the sentences which are either consecutive or concurrent. The defendant's attorney filed a motion with a memorandum requesting the Court to impose a concurrent sentence. The State filed a memorandum requesting this Court to impose consecutive sentences.

> "This Court was involved in a preliminary hearing where the Court heard the testimony of the victim, where the victim was required to openly testify in Court as to what had occurred.

> "Starting April, 22, 2019, through April 26, 2019, this Court heard testimony during a jury trial and evidence from both the State and the defense and at one point defendant took the stand and admitted that he had written letters while in the Crawford County jail complaining that the victim had willingly participated in these crimes.

> "The defendant spoke today about what had happened to him, and nothing had happened to the victim. He has not taken responsibility for his wrongful conduct.

24

"This Court finds the defendant's crimes for which he was convicted and for which he accepts no responsibility require a harsh sentence. The harm occasioned upon the young victim and her family requires this Court to impose long-term incarceration to protect not only the victim and her family but also this community, and to deter the defendant and others from committing similar crimes in the future."

Though not required to, the district court explained its reasoning and listed several factors to support its decision to run the 18 sentences consecutive.

Noches-Padilla argues his sentence is effectively a life sentence without a possibility of parole and, because of its length, his sentence is arbitrary because it is impossible for him to serve its entirety. In *State v. Lippard*, No. 114,588, 2017 WL 3837700, at *16 (Kan. App. 2017) (unpublished opinion), the defendant received nine consecutive hard 25 life sentences, plus 118 months' imprisonment. The *Lippard* panel acknowledged that several consecutive hard 25 life sentences create a practical result of a life sentence without parole. But, as that panel noted, just because this fact is technically true, it does not mean the district court abused its discretion in imposing the sentence. The panel held the fact the defendant's sentence "is far greater than he will ever be able to serve does not, in itself, make the sentence excessive." 2017 WL 3837700, at *16; see also *State v. Pham*, 281 Kan. 1227, 1265, 136 P.3d 919 (2006) (life imprisonment followed by 1,306 months served consecutively was not abuse of discretion or excessive).

The same logic applies here. Although Noches-Padilla's sentence is even longer (15 hard 25 life sentences compared to Lippard's 9), K.S.A. 2020 Supp. 21-6819(b) grants the district court the legal authority to impose consecutive sentences—without a cap on the number of life sentences that can be run consecutive. The mere fact the consecutive sentences result in such a long term of imprisonment that Noches-Padilla could never serve its entirety does not, in of itself, mean the sentence was an abuse of discretion.

Noches-Padilla also argues his sentence was not proportionate to the crimes because even those convicted of murder have an opportunity for parole. Noches-Padilla relies on *Kennedy v. Louisiana*, 554 U.S. 407, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008), to explain forcible rape of a child is a less serious crime than murder. But *Kennedy* dealt with whether the Eighth Amendment to the United States Constitution forbade the death penalty for child rape and is not applicable to deciding whether a district court abused its discretion for imposing consecutive life sentences. See 554 U.S. at 413. Besides, our courts have previously stated the fact that certain nonhomicide crimes have harsher punishments does not render those penalties unconstitutional, noting:

> "'There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicides as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment.
>
> ". . . Jessica's Law is not the only Kansas statute that provides for more severe penalties for nonhomicide crimes.' *State v. Woodard*, 294 Kan. 717, 723, 280 P.3d 203 (2012)." *Lippard*, 2017 WL 3837700, at *16.

The mere fact that convicted murderers may have a chance at parole and Noches-Padilla does not due to his consecutive sentences does not render the district court's decision to impose consecutive sentences an abuse of discretion.

Finally, Noches-Padilla attempts to distinguish his case from two unpublished cases from our court. Noches-Padilla argues the decisions in *Lippard* and *State v. Satchell*, No. 116,151, 2017 WL 6395837 (Kan. App. 2017) (unpublished opinion), *aff'd in part and vacated in part* 311 Kan. 633, 466 P.3d 459 (2020), are different because the amount of life sentences and time served are much smaller than Noches-Padilla's. But Noches-Padilla does not explain why this means the district court abused its discretion in *this* particular case while the district courts in those cases did not. Nothing in those cases

or in K.S.A. 2020 Supp. 21-6819(b) suggests any limiting factor to the number of hard 25 life imprisonment sentences before the possibility of parole.

There are several purposes for sentencing a convicted defendant: retribution, deterrence, incapacitation, and rehabilitation. *State v. Ayers*, 309 Kan. 162, 165, 432 P.3d 663 (2019). The district court noted the need for punishing Noches-Padilla for particularly severe crimes for which he took no responsibility; the need to protect A.H., her family, and the community; and the need to deter Noches-Padilla and others from committing similar crimes in the future.

Noches-Padilla's crimes were particularly heinous. He occupied a position of trust acting as A.H.'s stepfather. Rather than use that position to help A.H., he turned her into a sexual object for his pleasure, sexually abusing her and raping her for over five years. Noches-Padilla forced A.H. to participate in sexual intercourse with him and would often demand her to be ready at a certain time. He also threatened A.H. and her family if she ever confessed. Even when her mother learned the truth, Noches-Padilla called the school to instruct A.H. to lie. Noches-Padilla wrote letters to his family blaming A.H. as the instigator and aggressor in the sexual relationship. At sentencing, after being convicted of 18 charges, Noches-Padilla still refused to take responsibility and spent his entire time addressing the district court about how he had been mistreated in prison, ignoring his victim's suffering.

Noches-Padilla's request for concurrent hard sentences would have been the equivalent of receiving a sentence for one Jessica's Law crime. See *Lippard*, 2017 WL 3837700, at *16. But Noches-Padilla did not commit just one crime. He sexually abused and raped A.H. many times. The consecutive sentences imposed by the district court "merely took into account the prolonged sexual abuse" Noches-Padilla inflicted upon A.H. See 2017 WL 3837700, at *16. The district court did not abuse its discretion.

As the district court committed no reversible error during the trial or at sentencing, we affirm Noches-Padilla's convictions and sentences.

Affirmed.